Dennis Jacobs, Circuit Judge, concurring:
I concur in Parts I and II.B.3 of the opinion of the Court (Associational Discrimination) and I therefore concur in the result. Mr. Zarda does have a sex discrimination claim under Title VII based on the allegation that he was fired because he was a man who had an intimate relationship with another man. I write separately because, of the several justifications advanced in that opinion, I am persuaded by one; and as to associational discrimination, the opinion of the Court says somewhat more than is necessary to justify it. Since a single justification is sufficient to support the result, I start with associational discrimination, and very briefly explain thereafter why the other grounds leave me unconvinced.
I
Supreme Court law and our own precedents on race discrimination militate in favor of the conclusion that sex discrimination based on one's choice of partner is an impermissible basis for discrimination under Title VII. This view is an extension of existing law, perhaps a cantilever, but not a leap.
First: this Circuit has already recognized associational discrimination as a Title VII violation. In Holcomb v. Iona Coll., 521 F.3d 130 (2d Cir. 2008), we considered a claim of discrimination under Title VII by a white man who alleged that he was fired because of his marriage to a black woman. We held that "an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race ... The reason is simple: where an employee is subjected to adverse action because an employer disapproves of interracial association, *133 the employee suffers discrimination because of the employee's own race." Id. at 139 (emphasis in original).
Second: the analogy to same-sex relationships is valid because Title VII "on its face treats each of the enumerated categories exactly the same"; thus principles announced in regard to sex discrimination "apply with equal force to discrimination based on race, religion, or national origin." Price Waterhouse v. Hopkins, 490 U.S. 228, 243 n.9, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion). And, presumably, vice versa.
Third: There is no reason I can see why associational discrimination based on sex would not encompass association between persons of the same sex. In Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), a case in which a man alleged same-sex harassment, the Supreme Court stated that Title VII prohibits " 'discriminat[ion] ... because of ... sex' " and that Title VII "protects men as well as women." Id. at 79-80, 118 S.Ct. 998.
This line of cases, taken together, demonstrates that discrimination based on same-sex relationships is discrimination cognizable under Title VII notwithstanding that the sexual relationship is homosexual.
Zarda's complaint can be fairly read to allege discrimination based on his relationship with a person of the same sex. The allegation is analogous to the claim in Holcomb, in which a person of one race was discriminated against on the basis of race because he consorted with a person of a different race. In each instance, the basis for discrimination is disapproval and prejudice as to who is permitted to consort with whom, and the common feature is the sorting: one is the mixing of race and the other is the matching of sex.
This outcome is easy to analogize to Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). While Loving was an Equal Protection challenge to Virginia's miscegenation law, the law was held unconstitutional because it impermissibly drew distinctions according to race. Id. at 10-11, 87 S.Ct. 1817. In the context of a person consorting with a person of the same sex, the distinction is similarly drawn according to sex, and is therefore unlawful under Title VII.
Amicus Mortara argues that race discrimination aroused by couples of different race is premised on animus against one of the races (based on the idea of white supremacy), and that discrimination against homosexuals is obviously not driven by animus against men or against women. But it cannot be that the protections of Title VII depend on particular races; there are a lot more than two races, and Title VII likewise protects persons who are multiracial. Mr. Mortara may identify analytical differences; but to persons who experience the racial discrimination, it is all one.
Mr. Mortara also argues that discrimination based on homosexual acts and relationships is analytically distinct from discrimination against homosexuals, who have a proclivity on which they may or may not act. Academics may seek to know whether discrimination is illegal if based on same-sex attraction itself: they have jurisdiction over interesting questions, and we do not. But the distinction is not decisive. See Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez, 561 U.S. 661, 689, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010) ("Our decisions have declined to distinguish between status and conduct in" the context of sexual orientation.). In any event, the distinction between act and attraction does not arise in this case because Mr. Zarda's termination *134 was sparked by his avowal of a same-sex relationship.
A ruling based on Mr. Zarda's same-sex relationship resolves this appeal; good craft counsels that we go no further. Much of the rest of the Court's opinion amounts to woke dicta.
II
The opinion of the Court characterizes its definitional analysis as "the most natural reading of Title VII." Maj. Op. at 112. Not really. "Sex," which is used in series with "race" and "religion," is one of the words least likely to fluctuate in meaning. I do not think I am breaking new ground in saying that the word "sex" as a personal characteristic refers to the male and female of the species. Nor can there be doubt that, when Title VII was drafted in 1964, "sex" drew the distinction between men and women. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).
In the opinion of the Court, the word "sex" undergoes modification and expansion. Thus the opinion reasons: "[l]ogically, because sexual orientation is a function of sex and sex is a protected characteristic under Title VII, it follows that sexual orientation is also protected." Maj. Op. at 113. It is undeniable that sexual orientation is a "function of sex" in the (unhelpful) sense that it cannot be defined or understood without reference to sex. But surely that is because it has to do with sex-as so many things do. Everything that cannot be understood without reference to sex does not amount to sex itself as a term in Title VII. So it seems to me that all of these arguments are circular as well as unnecessary.
III
The opinion of the Court relies in part on a comparator test, asking whether the employee would have been treated differently "but for" the employee's sex. But the comparator test is an evidentiary technique, not a tool for textual interpretation. "[T]he ultimate issue" for a court to decide in a Title VII case "is the reason for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace." Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 121 (2d Cir. 2004). The opinion of the Court builds on the concept of homosexuality as a subset of sex, and this analysis thus merges in a fuzzy way with the definitional analysis. But when the comparator test is used for textual interpretation, it carries in train ramifications that are sweeping and unpredictable: think fitness tests for different characteristics of men and women, not to mention restrooms.
IV
The opinion of the Court relies on the line of cases that bars discrimination based on sexual stereotype: the manifestation of it or the failure to conform to it. There are at least three reasons I am unpersuaded.
Anti-discrimination law should be explicable in terms of evident fairness and justice, whereas the analysis employed in the opinion of the Court is certain to be baffling to the populace.
The Opinion posits that heterosexuality is just another sexual convention, bias, or stereotype-like pants and skirts, or hairdos. This is the most arresting notion in the opinion of the Court. Stereotypes are generalizations that are usually unfair or defective. Heterosexuality and homosexuality are both traits that are innate and true, not stereotypes of anything else.
*135 If this case did involve discrimination on the basis of sexual stereotype, it would have been remanded to the District Court on that basis, as was done in Christiansen v. Omnicom Grp., Inc., 852 F.3d 195 (2d Cir. 2017) (per curiam). The reason it could not be remanded on that basis is that the record does not associate Mr. Zarda with any sexual stereotyping. The case arises from his verbal disclosure of his sexual orientation during his employment as a skydiving instructor, and that is virtually all we know about him. It should not be surprising that a person of any particular sexual orientation would earn a living jumping out of airplanes; but Mr. Zarda cannot fairly be described as evoking somebody's sexual stereotype of homosexual men. So this case does not present the (settled) issue of sexual stereotype, which I think is the very reason we had to go in banc in order to decide this case. As was made clear as recently as March 2017, "being gay, lesbian, or bisexual, standing alone, does not constitute nonconformity with a gender stereotype that can give rise to a cognizable gender stereotyping claim." Id. at 201.
José A. Cabranes, Circuit Judge, concurring in the judgment:
I concur only in the judgment of the Court. It will take the courts years to sort out how each of the theories presented by the majority applies to other Title VII protected classes: "race, color, religion, ... [and] national origin." 42 U.S.C. § 2000e-2(a)(1).
This is a straightforward case of statutory construction. Title VII of the Civil Rights Act of 1964 prohibits discrimination "because of ... sex." Id. Zarda's sexual orientation is a function of his sex. Discrimination against Zarda because of his sexual orientation therefore is discrimination because of his sex, and is prohibited by Title VII.
That should be the end of the analysis.[1]
Sack, Circuit Judge, concurring in the judgment, and in parts I (Jurisdiction), II.A (The Scope of Title VII), II:B.3 (Associational Discrimination), and II:C (Subsequent Legislative Developments) of the opinion for the Court.
We decide this appeal in the context of something of a revolution[1] in American law respecting gender and sex. It appears to reflect, inter alia , many Americans' evolving regard for and social acceptance of gay and lesbian persons. We are now called upon to address questions dealing directly with sex, sexual behavior, and sexual taboos, a discussion fraught with moral, religious, political, psychological, and other highly charged issues. For those reasons (among others), I think it is in the best interests of us all to tread carefully; to say no more than we must; to decide no more than is necessary to resolve this appeal. This is not for fear of offending, but for fear of the possible consequences of being mistaken in one unnecessary aspect or another of our decision.
In my view, the law of this Circuit governing what is referred to in the majority opinion as "associational discrimination"-discrimination against a person because of his or her association with another-is unsettled. What was embraced by this Court in Simonton v. Runyon , 232 F.3d 33 (2d Cir. 2000) (holding, by implication, that associational discrimination on the basis of sex is not cognizable under Title VII), *136 seems to have both been overtaken by, and to be inconsistent with, our later panel decision in Holcomb v. Iona College , 521 F.3d 130 (2d Cir. 2008) (holding directly that associational discrimination on account of race is unlawful under Title VII).[2] Choosing between the two approaches, as I think we must, I agree with the majority that Holcomb is right and that Simonton is therefore wrong.[3] It is principally on that basis that I concur in the judgment of the Court.
My declination to join other parts of the majority opinion does not signal my disagreement with them. Rather, inasmuch as, in my view, this appeal can be decided on the simpler and less fraught theory of associational discrimination, I think it best to stop there without then considering other possible bases for our judgment.
Raymond J. Lohier, Jr., Circuit Judge, concurring:
I agree with the majority opinion that there is no reasonable way to disentangle sex from sexual orientation in interpreting the plain meaning of the words "because of ... sex." The first term clearly subsumes the second, just as race subsumes ethnicity.[1] Oral Arg. Tr. at 53:5-6 (Government conceding that "ethnicity can be viewed as a subset of race"). From this central holding, the majority opinion explores the comparative approach, the stereotyping rationale, and the associational discrimination rationale to help determine "when a trait other than sex is ... a proxy for (or function of) sex." Maj. Op. at 116. But in my view, these rationales merely reflect nonexclusive "evidentiary technique[s]," Jacobs, J., Concurring Op. at 134, frameworks, or ways to determine whether sex is a motivating factor in a given case, rather than interpretive tools that apply necessarily across all Title VII cases. Zarda himself has described these three rationales as "evidentiary theories" or "routes." Oral Arg. Tr. at 4:17-18. On this understanding, I join the majority opinion as to Parts II.A and II.B.1.a, which reflect the textualist's approach, and join the remaining parts of the opinion only insofar as they can be said to apply to Zarda's particular case.
A word about the dissents. My dissenting colleagues focus on what they variously describe as the "ordinary, contemporary, common meaning" of the words "because of ... sex," Lynch, J., Dissenting Op. at 144 n.8; Livingston, J., Dissenting Op. at 167, or the "public meaning of [those] words adopted by Congress in light of the social problem it was addressing when it chose those words," Lynch, J., Dissenting Op. at 162. There are at least two problems with this position. First, as the majority opinion points out, cabining the *137 words in this way makes little or no sense of Oncale or, for that matter, Price Waterhouse. See Maj. Op. at 113-14. Second, their hunt for the "contemporary" "public" meaning of the statute in this case seems to me little more than a roundabout search for legislative history. Judge Lynch's laudable call (either as a way to divine congressional intent or as an interpretive check on the plain text approach) to consider what the legislature would have decided if the issue had occurred to the legislators at the time of enactment is, unfortunately, no longer an interpretive option of first resort. Time and time again, the Supreme Court has told us that the cart of legislative history is pulled by the plain text, not the other way around. The text here pulls in one direction, namely, that sex includes sexual orientation.
Gerard E. Lynch, Circuit Judge, with whom Judge Livingston joins as to Parts I, II, and III, dissenting:
Speaking solely as a citizen, I would be delighted to awake one morning and learn that Congress had just passed legislation adding sexual orientation to the list of grounds of employment discrimination prohibited under Title VII of the Civil Rights Act of 1964. I am confident that one day-and I hope that day comes soon-I will have that pleasure.
I would be equally pleased to awake to learn that Congress had secretly passed such legislation more than a half century ago-until I actually woke up and realized that I must have been still asleep and dreaming. Because we all know that Congress did no such thing.
I
Of course, today's majority does not contend that Congress literally prohibited sexual orientation discrimination in 1964. It is worth remembering the historical context of that time to understand why any such contention would be indefensible.
The Civil Rights Act as a whole was primarily a product of the movement for equality for African-Americans. It grew out of the demands of that movement, and was opposed by segregationist white members of Congress who opposed racial equality. Although the bill, even before it included a prohibition against sex discrimination, went beyond race to prohibit discrimination based on religion and national origin, there is no question that it would not have been under consideration at all but for the national effort to reckon to some degree with America's heritage of race-based slavery and government-enforced segregation.
It is perhaps difficult for people not then alive to understand that before the Civil Rights Act of 1964 became law, an employer could post a sign saying "Help Wanted; No Negroes Need Apply" without violating any federal law-and many employers did. Even the original House bill, introduced with the support of President Kennedy's Administration in 1963, did not prohibit racial discrimination by private employers. Language prohibiting employment discrimination by private employers on the grounds of "race, color, religion or national origin" was added later by a House subcommittee. See Francis J. Vaas, Title VII: Legislative History , 7 B.C. Indus. & Comm. L. Rev. 431, 434-35 (1966); Chuck Henson, Title VII Works-That's Why We Don't Like It , 2 U. Miami Race & Soc. Just. L. Rev. 41, 62-63, 64 n.103 (2012).
Movement on the bill was slow. It was only after the March on Washington in the summer of 1963, the assassination of President Kennedy in November of that year, and President Johnson's strong support for a civil rights bill that prohibited racial discrimination in employment, that the legislation made progress in Congress. Todd.
*138 S. Purdum, An Idea Whose Time Has Come 111-13, 151 (2014). But the private employment discrimination provision, like other sections of the bill prohibiting racial discrimination in public accommodations and federally funded programs, was openly and bitterly opposed by a large contingent of southern members of Congress. See Louis Menand, The Sex Amendment , The New Yorker (July 21, 2014), http://www.newyorker.com/magazine/2014/07/21/sex-amendment. Its passage was by no means assured when the floor debates in the House began.
From the moment President Kennedy proposed the Civil Rights Act in 1963, women's rights groups, with the support of some members of Congress, had urged that sex discrimination be included as a target of the legislation. Purdum, supra , at 196. The movements in the United States for gender and racial equality have not always marched in tandem-although there was some overlap between abolitionists and supporters of women's suffrage, suffragists often relied on the racially offensive argument that it was outrageous that white women could not vote when black men could.[1] But by the 1960s, many feminist advocates consciously adopted arguments parallel to those of the civil rights movement, and there was growing recognition that the two causes were linked in fundamental ways.[2]
Women's rights groups had been arguing for laws prohibiting sex discrimination since at least World War II, and had been gaining recognition for the agenda of the women's rights movement in other arenas. In addition to supporting (at least rhetorically) civil rights for African-Americans, President Kennedy had taken tentative steps towards support of women's rights as well. In December 1961, he created the President's Commission on the Status of Women, chaired until her death by Eleanor Roosevelt. Exec. Order No. 10980, 26 Fed. Reg. 12,059 (Dec. 14, 1961). Among *139 other goals, the Commission was charged with developing recommendations for "overcoming discriminations in ... employment on the basis of sex," and suggesting "services which will enable women to continue their role [ ]as wives and mothers while making a maximum contribution to the world around them." Id.
The Commission's report highlighted the increasing role of women in the workplace, noting (in an era when the primacy of women's role in child-rearing and home-making was taken for granted) that even women with children generally spent no more than a decade or so of their lives engaged in full-time child care, allowing a significant portion of women's lives to be dedicated to education and employment. American Women : Report of The President's Commission on the Status of Women 6-7 (1963). Accordingly, the Commission advocated a variety of steps to improve women's economic position. Id. at 6-7, 10. While those recommendations did not include federal legislation prohibiting employment discrimination on the basis of sex, they did include a commitment to equal opportunity in employment by federal contractors and proposed such equality as a goal for private employers-as well as proposing other innovations, such as paid maternity leave and universal high-quality public child care, that have yet to become the law of the land. Id. at 20, 30, 43.
Nevertheless, the notion that women should be treated equally at work remained controversial. By 1964, only two states, Hawaii and Wisconsin, prohibited sex discrimination in employment. Purdum, supra , at 196. Although decades had passed since the Supreme Court announced in Muller v. Oregon , 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908), that laws limiting the hours that women could work did not violate the Fourteenth Amendment, but rather were an appropriate accommodation for women's fragile constitutions and more pressing maternal obligations, ids="3642006" index="349" url="https://cite.case.law/us/208/412/">id. at 420-21, 28 S.Ct. 324, state laws "protecting" women from the rigors of the workplace remained commonplace. Purdum, supra , at 196; see also Hoyt v. Florida , 368 U.S. 57, 62, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961) (upholding a law requiring women, specifically, to opt in to jury service, in part because "woman is still regarded as the center of home and family life").
Accordingly, when Representative Howard W. Smith of Virginia, a die-hard opponent of integration and federal legislation to enforce civil rights for African-Americans, proposed that "sex" be added to the prohibited grounds of discrimination in the Civil Rights Act, there was reason to suspect that his amendment was an intentional effort to render the Act so divisive and controversial that it would be impossible to pass. See , e.g. , Ulane v. E. Airlines, Inc ., 742 F.2d 1081, 1085 (7th Cir. 1984) (suggesting that the "sex amendment was the gambit of a congressman seeking to scuttle adoption of the Civil Rights Act"); Comment, Sex Discrimination in Employment , 35 Fordham L. Rev. 503, 504 n.16 (1967). That might not have been the case, however. Like those early suffragettes who were ambivalent about, or hostile to, racial equality, Smith also had a prior history of support for (presumably white) women's equality. For example, he had been a longstanding supporter of a constitutional amendment guaranteeing equal rights to women. Purdum, supra , at 196; see also Gillian Thomas, Because of Sex 2 (2016).
Whatever Smith's subjective motivations for proposing it, the amendment was adamantly opposed by many northern liberals on the ground that it would undermine support for the Act as a whole. Purdum, supra , at 197; Menand, supra . Indeed, the *140 New York Times ridiculed the amendment, suggesting that, among other alleged absurdities, it would require Radio City Music Hall to hire male Rockettes, and concluding that "it would have been better if Congress had just abolished sex itself." Editorial, De-Sexing the Job Market , N.Y. Times, August 21, 1965.
But despite its contested origins, the adoption of the amendment prohibiting sex discrimination was not an accident or a stunt. Once the amendment was on the floor, it was aggressively championed by a coalition comprising most of the (few) women members of the House. Purdum, supra , at 197. Its subsequent adoption was consistent with a long history of women's rights advocacy that had increasingly been gaining mainstream recognition and acceptance.
Discrimination against gay women and men, by contrast, was not on the table for public debate. In those dark, pre-Stonewall days, same-sex sexual relations were criminalized in nearly all states. Only three years before the passage of Title VII, Illinois, under the influence of the American Law Institute's proposed Model Penal Code, had become the first state to repeal laws prohibiting private consensual adult relations between members of the same sex. Salvatore J. Licata, The Homosexual Rights Movement in the United States: A Traditionally Overlooked Area of American History , 6 J. Homosexuality 161, 171 (1981).
In addition to criminalization, gay men and women were stigmatized as suffering from mental illness. In 1964, both the American Psychiatric Association and the American Psychological Association regrettably classified homosexuality as a mental illness or disorder. As the Supreme Court recently explained, "[f]or much of the 20th century ... homosexuality was treated as an illness. When the American Psychiatric Association published the first Diagnostic and Statistical Manual of Mental Disorders in 1952, homosexuality was classified as a mental disorder, a position adhered to until 1973." Obergefell v. Hodges , --- U.S. ----, 135 S.Ct. 2584, 2596, 192 L.Ed.2d 609 (2015), citing Position Statement on Homosexuality and Civil Rights, 1973, in 131 Am. J. Psychiatry 497 (1974). It was not until two years later, in 1975, that the American Psychological Association followed suit and "adopted the same position [as the American Psychiatric Association], urging all mental health professionals to work to dispel the stigma of mental illness long associated with homosexual orientation." Brief of Am. Psychological Ass'n as Amicus Curiae , Boy Scouts of Am. v. Dale , 530 U.S. 640, 120 S.Ct. 2446, 2454, 147 L.Ed.2d 554 (2000), citing Am. Psychological Ass'n, Minutes of the Annual Meeting of the Council of Representatives , in 30 Am. Psychologist 620, 633 (1975). Because gay identity was viewed as a mental illness and was, in effect, defined by participation in a criminal act, the employment situation for openly gay Americans was bleak.
Consider the rules regarding employment by the federal government. Starting in the 1940s and continuing through the 1960s, thanks to a series of executive orders repealing long-standing discriminatory policies, federal employment opportunities for African-Americans began to open up significantly. See, e.g. , Exec. Order No. 9980, 13 Fed. Reg. 4,311 (July 26, 1948) (prohibiting racial discrimination in civilian agencies); Exec. Order No. 10308, 16 Fed. Reg. 12,303 (December 3, 1951) (creating the Committee on Government Compliance to enforce the prohibition against racial discrimination by firms contracting with the government); Exec. Order No. 11114, 28 Fed. Reg. 6,485 (June 22, 1963) (extending prohibition against discrimination to all *141 federally-funded construction projects). In sharp contrast, in 1953 President Eisenhower signed an executive order excluding persons guilty of "sexual perversion" from government employment. Exec. Order No. 10450, 18 Fed. Reg. 2,489 (April 27, 1953) ; see also Licata, supra , at 167-68. During the same period, gay federal employees, or employees even suspected of being gay, were systematically hounded out of the service as "security risks" during Cold-War witchhunts. Licata, supra , at 167-68.
Civil rights and civil liberties organizations were largely silent.[3] Licata, supra , at 168. In an influential book about the political plight of gay people, Edward Sagarin, writing under the pseudonym Donald Webster Cory, sharply criticized the silence of the bar. Donald Webster Cory, The Homosexual in America: A Subjective Approach (1951). For instance, he described the response to the abusive tactics used against members of the military discharged for homosexual conduct as follows: "And who raises a voice in protest against such discrimination? No one. Where was the American Civil Liberties Union? Nowhere." Id. at 45. To the extent that civil rights organizations did begin to engage with gay rights during the early 1960s, they did so through the lens of sexual liberty, rather than equality, grouping the prohibition of laws against same-sex relations with prohibitions of birth control, abortion, and adultery.[4] Even by the mid-1960s, the ACLU was identified by Newsweek as the only group "apart from the homophile organizations" that opposed laws criminalizing homosexual acts. Leigh Ann Wheeler, How Sex Became a Civil Liberty 155 (2013).
Given the criminalization of same-sex relationships and arbitrary and abusive police harassment of gay and lesbian citizens, nascent gay rights organizations had more urgent concerns than private employment discrimination. As late as 1968, four years after the passage of Title VII, the North American Conference of Homophile Organizations proposed a "Homosexual Bill of Rights" that demanded five fundamental rights: that private consensual sex between *142 adults not be a crime; that solicitation of sex acts not be prosecuted except on a complaint by someone other than an undercover officer; that sexual orientation not be a factor in granting security clearances, visas, or citizenship; that homosexuality not be a barrier to service in the military; and that sexual orientation not affect eligibility for employment with federal, state, or local governments . Licata, supra , at 177 (emphasis added). Those proposals, which pointedly did not include a ban on private sector employment discrimination against gays, evidently had little traction with many Americans at the time. The first state to prohibit employment discrimination on the basis of sexual orientation even in the public sector was Pennsylvania, by executive order of the governor, in 1975-more than a decade after the Civil Rights Act had become law. James W. Button et al., The Politics of Gay Rights at the Local and State Level , in The Politics of Gay Rights 269, 272 (Craig A. Rimmerman et al. eds., 2000). It was not until 1982 that Wisconsin became the first state to ban both public and private sector discrimination based on sexual orientation. Id. at 273; see also Linda A. Mooney et al., Understanding Social Problems 467 (6th ed. 2009). Massachusetts followed in 1989. Button et al., supra , at 273. Notably, as discussed more fully below, these states did so by explicit legislative action adding "sexual orientation" to pre-existing anti-discrimination laws that already prohibited discrimination based on sex; they did not purport to "recognize" that sexual orientation discrimination was merely an aspect of already-prohibited discrimination based on sex.
In light of that history, it is perhaps needless to say that there was no discussion of sexual orientation discrimination in the debates on Title VII of the Civil Rights Act. If some sexist legislators considered the inclusion of sex discrimination in the bill something of a joke, or perhaps a poison pill to make civil rights legislation even more controversial, evidently no one thought that adding sexual orientation to the list of forbidden categories was worth using even in that way. Nor did those who opposed the sex provision in Title VII include the possibility that prohibiting sex discrimination would also prevent sexual orientation discrimination in their parade of supposed horribles. When Representative Emanuel Celler of New York, floor manager for the Civil Rights Bill in the House, rose to oppose Representative Smith's proposed amendment, he expressed concern that it would lead to such supposed travesties as the elimination of "protective" employment laws regulating working conditions for women, drafting women for military service, and revisions of rape and alimony laws. See 110 Cong. Rec. 2,577 (1964). He did not reference the prohibition of sexual orientation discrimination.[5] The idea was nowhere on the horizon.
*143 II
I do not cite this sorry history of opposition to equality for African-Americans, women, and gay women and men, and of the biases prevailing a half-century ago, to argue that the private intentions and motivations of the members of Congress can trump the plain language or clear implications of a legislative enactment. (Still less, of course, do I endorse the views of those who opposed racial equality, ridiculed women's rights, and persecuted people for their sexual orientation.) Although Chief Judge Katzmann has observed elsewhere that judicial warnings about relying on legislative history as an interpretive aid have been overstated, see Robert A. Katzmann, Judging Statutes 35-39 (2014), I agree with him, and with my other colleagues in the majority, that the implications of legislation flatly prohibiting sex discrimination in employment, duly enacted by Congress and signed by the President, cannot be cabined by citing the private prejudices or blind spots of those members of Congress who voted for it.[6] The above history makes it obvious to me, however, that the majority misconceives the fundamental public meaning of the language of the Civil Rights Act. The problem sought to be remedied by adding "sex" to the prohibited bases of employment discrimination was the pervasive discrimination against women in the employment market, and the chosen remedy was to prohibit discrimination that adversely affected members of one sex or the other. By prohibiting discrimination against people based on their sex, it did not, and does not, prohibit discrimination against people because of their sexual orientation.
A
To start, the history of the overlapping movements for equality for blacks, women, and gays, and the differing pace of their progress, as outlined in the previous section, tells us something important about what the language of Title VII must have meant to any reasonable member of Congress, and indeed to any literate American, when it was passed-what Judge Sykes has called the "original public meaning" of the statute. Hively v. Ivy Tech Cmty. Coll. of Ind. , 853 F.3d 339, 362 (7th Cir. 2017) (en banc ) (Sykes, J ., dissenting) (emphasis added). That history tells us a great deal about why the legislators who constructed and voted for the Act used the specific language that they did.
The words used in legislation are used for a reason. Legislation is adopted in response to perceived social problems, and legislators adopt the language that they do to address a social evil or accomplish a desirable goal. The words of the statute take meaning from that purpose, and the principles it adopts must be read in light of the problem it was enacted to address. The words may indeed cut deeper than the legislators who voted for the statute fully understood or intended: as relevant here, a law aimed at producing gender equality in the workplace may require or prohibit employment *144 practices that the legislators who voted for it did not yet understand as obstacles to gender equality. Nevertheless, it remains a law aimed at gender inequality, and not at other forms of discrimination that were understood at the time, and continue to be understood, as a different kind of prejudice, shared not only by some of those who opposed the rights of women and African-Americans, but also by some who believed in equal rights for women and people of color.
The history I have cited is not "legislative history" narrowly conceived. It cannot be disparaged as a matter of attempts by legislators or their aides to influence future judicial interpretation-in the direction of results they could not convince a majority to support in the overt language of a statute-by announcing to largely empty chambers, or inserting into obscure corners of committee reports, explanations of the intended or unintended legal implications of a bill. Nor am I seeking to infer the unexpressed wishes of all or a majority of the hundreds of legislators who voted for a bill without addressing a particular question of interpretation. Rather, I am concerned with what principles Congress committed the country to by enacting the words it chose.[7] I contend that these principles can be illuminated by an understanding of the central public meaning of the language used in the statute at the time of its enactment.[8]
If the specifically legislative history of the "sex amendment" is relatively sparse in light of its adoption as a floor amendment, see Maj. Op. at 128 n.31, the broader political and social history of the prohibition *145 of sex discrimination in employment is plain for all to read. The history of the 20th century is, among other things, a history of increasing equality of men and women. Recent events remind us of how spotty that equality remains, and how inequality persists even with respect to the basic right of women to physical security and control of their own bodies. But the trend is clear, and it is particularly emphatic in the workplace.
That history makes it equally clear that the prohibition of discrimination "based on sex" was intended to secure the rights of women to equal protection in employment. Put simply, the addition of "sex" to a bill to prohibit employers from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, ... or national origin," 42 U.S.C. § 2000e-2(a)(1), was intended to eliminate workplace inequalities that held women back from advancing in the economy, just as the original bill aimed to protect African-Americans and other racial, national, and religious minorities from similar discrimination. The language of the Act itself would have been so understood not only by members of Congress, but by any politically engaged citizen deciding whether to urge his or her representatives to vote for it. As Judge Sykes noted in her dissent in the Seventh Circuit's encounter with the same issue we face today, citing a 1960s dictionary, "In common, ordinary usage in 1964-and now, for that matter-the word 'sex' means biologically male or female ; it does not also refer to sexual orientation." Hively , 853 F.3d at 362-63 (Sykes, J ., dissenting) (emphasis in original).[9] On the verge of the adoption of historic legislation to address bigotry against African-Americans on the basis of race, women in effect stood up and said "us, too," and Congress agreed.
The majority cites judicial interpretations of Title VII as prohibiting sexual harassment, and allowing hostile work environment claims, in an effort to argue that the expansion they are making simply follows in this line. Maj. Op. at 114, 115. But the fact that a prohibition on discrimination against members of one sex may have unanticipated consequences when courts are asked to consider carefully whether a given practice does, in fact, discriminate against members of one sex in the workplace does not support extending Title VII by judicial construction to protect an entirely different category of people. It is true that what counts as discrimination against members of one sex may not have been fully fleshed out in the minds of supporters of the legislation, but it is easy enough to illustrate how the language of a provision enacted to accomplish the goal of equal treatment of the sexes compels results that may not have been specifically intended by its enacters.
To begin with, just as laws prohibiting racial discrimination, adopted principally to address some of the festering national wrongs done to African-Americans, protect members of all races, including then-majority *146 white European-Americans, the prohibition of sex discrimination by its plain language protects men as well as women, whether or not anyone who voted on the bill specifically considered whether and under what circumstances men could be victims of gender-based discrimination. That is not an expansion of Title VII, but is a conclusion mandated by its text: Congress deliberately chose to protect women and minorities not by prohibiting discrimination against "African-Americans" or "Jews" or "women," but by neutrally prohibiting discrimination against any individual "based on race, ... religion, [or] sex." 42 U.S.C. § 2000e-2(a)(1). That choice of words is clearly intentional, and represents a commitment to a principle of equal treatment of races, religions, and sexes that is important, even if the primary intended beneficiaries of the legislation-those most in need of its protection-are members of the races, religions, and gender that have suffered the most from in equality in the past.
Other interpretations of the statute that may not have occurred to members of the overwhelmingly male Congress that adopted it seem equally straightforward. Perhaps it did not occur to some of those male members of Congress that sexual harassment of women in the workplace was a form of employment discrimination, or that Title VII was inconsistent with a "Mad Men" culture in the office.[10] But although a few judges were slow to recognize this point, see , e.g. , Barnes v. Train , No. 1828-73, 1974 WL 10628, at *1 (D.D.C. Aug. 9, 1974), rev'd sub nom. Barnes v. Costle , 561 F.2d 983 (D.C. Cir. 1977), as soon as the issue began to arise in litigation, courts quickly recognized that for an employer to expect members of one sex to provide sexual favors as a condition of employment from which members of the other sex are exempt, or to view the only value of female employees as stemming from their sexualization, constitutes a fundamental type of discrimination in conditions of employment based on sex. See, e.g. , Barnes v. Costle , 561 F.2d at 989 (finding that retaliation by plaintiff's supervisor when she resisted his sexual advances "was plainly based on [plaintiff's] gender").[11]
The reason why any argument to the contrary would fail is not a matter of simplistic application of a formal standard, along the lines of "well, the employer wouldn't have asked the same of a man, so it's sex discrimination." Sexual exploitation has been a principal obstacle to the equal *147 participation of women in the workplace, and whether or not individual legislators intended to prohibit it when they cast their votes for Representative Smith's amendment, both the literal language of that amendment and the elimination of the social evil at which it was aimed make clear that the statute must be read to prohibit it.[12]
The same goes for other forms of "hostile environment" discrimination. The history of resistance to racial integration illustrates why. Employers forced to take down their "whites only" signs could not be permitted to retreat to the position that "you can make me hire black workers, but you can't make me welcome them." Making black employees so un welcome that they would be deterred from seeking or retaining jobs previously reserved for whites must be treated as an instance of prohibited racial discrimination-and the same clearly goes for sex discrimination. The Supreme Court recognized that point, in exactly those terms:
The phrase "terms, conditions or privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination. ... Nothing in Title VII suggests that a hostile environment based on discriminatory sexual harassment should not be likewise prohibited.
Meritor Sav. Bank, FSB v. Vinson , 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks, brackets and emphasis omitted).
But such interpretations of employment "discrimination against any individual ... based on sex" do not say anything about whether discrimination based on other social categories is covered by the statute. Just as Congress adopted broader language than discrimination "against women," it adopted narrower language than "discrimination based on personal characteristics or classifications unrelated to job performance." Title VII does not adopt a broad principle of equal protection in the workplace; rather, its language singles out for prohibition discrimination based on particular categories and classifications that have been used to perpetuate injustice-but not all such categories and classifications. That is not a matter of abstract justice, but of political reality. Those groups that had succeeded by 1964 in persuading a majority of the members of Congress that unfair treatment of them ought to be prohibited were included; those who had not yet achieved that political objective were not.
Thus, if Representative Smith's amendment had been defeated, Title VII would still be a landmark prohibition of the kinds of race-, religion-, and national origin-based employment discrimination that had historically disadvantaged blacks, Jews, Catholics, or Mexican-Americans. But it would not have protected women, and a subsequent shift in popular support for such protection would not have changed that fact, without legislative action. Similarly, *148 the statute did not protect those discriminated against, similarly unfairly, on the basis of age or disability; that required later legislation. See, e.g. , Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq . ; Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq .
None of this, of course, is remotely to suggest that employment discrimination on the basis of sexual orientation is somehow not invidious and wrong. But not everything that is offensive or immoral or economically inefficient is illegal, and if the view that a practice is offensive or immoral or economically inefficient does not command sufficiently broad and deep political support to produce legislation prohibiting it, that practice will remain legal. In the context of private-sector employment, racial discrimination was just as indefensible before 1964 as it is today, but it was not illegal. Discrimination against women, as President Kennedy's commission understood, was just as unfair, and just as harmful to our economy, before Title VII prohibited it as it is now, but if Congress had not adopted Representative Smith's amendment, it would have remained legal. Employment discrimination against older workers, and against qualified individuals with disabilities, imposed unfair burdens on those categories of individuals in 1964, yet it remained legal after the Civil Rights Act of 1964 became law, because Congress did not at that time choose to prohibit such discrimination. Congress is permitted to choose what types of social problems to attack and by which means. The majority says that "we have stated that 'Title VII should be interpreted broadly to achieve equal employment opportunity,' " Maj. Op. at 111, quoting Huntington Branch, N.A.A.C.P. v. Town of Huntington , 844 F.2d 926, 935 (2d Cir. 1988), but of course that dictum[13] appeared in the context of a discussion of racial discrimination. Congress, in fact, did not legislate in 1964 "broadly to achieve equal employment opportunity" for all Americans, but instead opted to prohibit only certain categories of unfair discrimination. It did not then prohibit, and alas has not since prohibited, discrimination based on sexual orientation.
B
The majority's linguistic argument does not change the fact that the prohibition of employment discrimination "because of ... sex" does not protect gays and lesbians. Simply put, discrimination based on sexual orientation is not the same thing as discrimination based on sex. As Judge Sykes explained,
[t]o a fluent speaker of the English language-then and now-the ordinary meaning of the word "sex" does not fairly include the concept of "sexual orientation." The two terms are never used interchangeably, and the latter is not subsumed within the former; there is no overlap in meaning. ... The words plainly describe different traits, and the separate and distinct meaning of each term is easily grasped. More specifically to the point here, discrimination "because of sex" is not reasonably understood to include discrimination based on sexual orientation, a different immutable characteristic. Classifying people by sexual orientation is different than classifying them by sex.
*149 Hively , 853 F.3d at 363 (Sykes, J ., dissenting) (footnote omitted).
Of course, the majority does not really dispute this common-sense proposition. It does not say that "sex discrimination" in the ordinary meaning of the term is literally the same thing as "sexual orientation discrimination." Rather, the majority argues that discrimination based on sex encompasses discrimination against gay people because discrimination based on sex encompasses any distinction between the sexes that an employer might make for any reason.[14] The argument essentially reads "discriminate" to mean pretty much the same thing as "distinguish." And indeed, there are recognized English uses of "discriminate," particularly when followed with "between" or "from," that imply nothing invidious, but merely mean "to perceive, observe or note [a] difference," or "[t]o make or recognize a distinction." The Oxford English Dictionary Online, http://www.oed.com (search for "Discriminate," verb, definitions 2a and 2b). For example, a person with perfect pitch is capable of discriminating a C from a C-sharp. But in the language of civil rights, a different and stronger meaning applies, that references invidious distinctions: "To treat a person or group in an unjust or prejudicial manner, esp[ecially] on the grounds of race, gender, sexual orientation, etc.; frequently with against ." Id . (definition 4).
And that is indeed the sense in which Title VII uses the word: the statute prohibits such practices as "fail[ing] or refus[ing] to hire or to discharge" persons on account of their race or sex or other protected characteristic, or "otherwise to discriminate against any individual" with respect to employment terms. 42 U.S.C. § 2000e-2(a)(1) (emphasis added). In other words, it is an oversimplification to treat the statute as prohibiting any distinction between men and women in the workplace, still less any distinction that so much as requires the employer to know an employee's sex in order to be applied, cf. Maj. Op. at 112-13; the law prohibits discriminating against members of one sex or the other in the workplace.
That point may have little bite in the context of racial discrimination. The different "races" are defined legally and socially, and not by actual biological or genetic differences-both Hitler's Nuremberg laws and American laws imposing slavery and segregation had to define, arbitrarily, how much ancestry of a particular type consigned persons to a disfavored category, since there is no scientific or genetic basis for distinguishing a "Jew" or a "member of the colored race" from anyone else. And since no biological factor can support any job qualification based on race, courts have taken the view that to distinguish is , for the most part, to discriminate against. But in the area of sex discrimination, where the groups to be treated equally do have potentially relevant biological differences, not every distinction between men and women in the workplace constitutes discrimination against one gender or the other.[15] The *150 distinctions that were prohibited, however, in either case, are those that operate to the disadvantage of (principally) the disfavored race or sex. That is the social problem that the statute aimed to correct.
Opponents of Title VII, and later of the Equal Rights Amendment ("ERA"), were fond of conjuring what they thought of as unthinkable or absurd consequences of gender equality. Some of those proved not so unthinkable or absurd at all. Workplace "protective" legislation that applied only to women soon fell by the wayside, see 29 C.F.R. § 1604.2(b)(1) (stating that protective laws for women "conflict with and are superseded by [T]itle VII"), despite Representative Cellar's fears, without adverse consequences. But other distinctions based on sex remain, and their legality is either assumed, or at a minimum requires more thought than just "but that's a distinction based on sex, so it's illegal."
Distinctions based on personal privacy, for example, remain in place. When opponents of the ERA, like Senator Ervin, argued that under the ERA "there can be no exception for elements of publically [sic ] imposed sexual segregation on the basis of privacy between men and women," 118 Cong. Rec. 9,564 (1972), that objection was derided by Senator Marlow Cook of Kentucky as the "potty" argument, id. at 9,531. Title VII too does not prohibit an employer from having separate men's and women's toilet facilities. Nor does it prohibit employer policies that differentiate between men and women in setting requirements regarding hair lengths. Thus, in Longo v. Carlisle DeCoppet & Co. , we held that a policy "requiring short hair on men and not on women" did not violate Title VII. 537 F.2d 685, 685 (2d Cir. 1976) ; see also Tavora v. N.Y. Mercantile Exch. , 101 F.3d 907, 908-09 (2d Cir. 1996) (same).
Dress codes provide a more complicated example. It is certainly arguable that some forms of separate dress codes further stereotypes harmful to workplace equality for women; requiring female employees to wear "Hooters"-style outfits but male employees doing the same work to wear suit and tie would not stand scrutiny. But what of a pool facility that requires different styles of bathing suit for male and female lifeguards? Judge Cabranes's concurrence would seem to prohibit that practice, but I believe, and I expect Judge Cabranes would agree, that a pool that required both male and female lifeguards to wear a uniform consisting only of trunks would violate Title VII, while one that prescribed trunks for men and a bathing suit covering the breasts for women would not.
More controversial distinctions, such as different fitness requirements for men and women applying for jobs involving physical strength, have also been upheld. In a recent case, the Fourth Circuit rejected the *151 notion that Title VII prohibits gender-normed physical fitness benchmarks pursuant to which male FBI agent trainees must perform 30 push-ups, while female trainees need only do 14. Bauer v. Lynch , 812 F.3d 340, 342, 351 (4th Cir.), cert. denied, --- U.S. ----, 137 S.Ct. 372, 196 L.Ed.2d 290 (2016). In upholding this distinction, the court noted that of "the few decisions to confront the use of gender-normed physical fitness standards in the Title VII context, none has deemed such standards to be unlawful," id. at 348, because courts have recognized that some physiological differences between men and women "impact their relative abilities to demonstrate the same levels of physical fitness," id. at 351. Thus, the court in Bauer recognized that to distinguish between the sexes is not always to discriminate against one or the other. Indeed, a failure to impose distinct fitness requirements for men and women may be found to violate Title VII, if it has a disparate impact on one sex and the employer cannot justify the requirement as a business necessity. See Lanning v. Se. Pa. Transp. Auth. (SEPTA), 181 F.3d 478, 494 (3d Cir. 1999) (applying Civil Rights Act of 1991 and finding that time cutoff for 1.5 mile run for officers had a disparate impact, when women had a pass rate of only 6.7%, compared to a 55.6% pass rate for men, and remanding to district court to determine whether the score represents "the minimum qualifications necessary for successful performance of the job in question"). Taken to its logical conclusion, though, the majority's interpretation of Title VII would do away with this understanding of the Act.
These examples suffice to illustrate two points relevant to the supposedly simple interpretation of sex-based discrimination relied upon by the majority. First, it is not the case that any employment practice that can only be applied by identifying an employee's sex is prohibited. Second, neither can it be the case that any discrimination that would be prohibited if race were the criterion is equally prohibited when gender is used.[16] Obviously, Title VII does not permit an employer to maintain racially segregated bathrooms, nor would it allow different-colored or different-designed bathing costumes for white and black lifeguards. Such distinctions would smack of racial subordination, and would impose degrading differences of treatment on the basis of race. Precisely the same distinctions between men and women would not.[17]
Nor does the example of "discrimination based on traits that are a function of sex, such as life expectancy," Maj. Op. at 112, help the majority's cause. Discrimination of that sort, as the majority notes, could permit gross discrimination against female employees "by using traits that are associated with sex as a proxy for sex." Id . at 112. That is certainly so as to "traits that are a function of sex," such as pregnancy or the capacity to become pregnant. But it is not so as to discrimination based on *152 sexual orientation. Same-sex attraction is not "a function of sex" or "associated with sex" in the sense that life expectancy or childbearing capacity are.[18] A refusal to hire gay people cannot serve as a covert means of limiting employment opportunities for men or for women as such; a minority of both men and women are gay, and discriminating against them discriminates against them , as gay people, and does not differentially disadvantage employees or applicants of either sex.[19] That is not the case with other forms of "sex-plus" discrimination that single out for disfavored status traits that are, for example, common to women but rare in men.[20]
C
That "because of ... sex" did not, and still does not, cover sexual orientation, is further supported by the movement, in both Congress and state legislatures, to enact legislation protecting gay men and women against employment discrimination. This movement, which has now been successful in twenty-two states-including all three in our Circuit-and the District of Columbia, has proceeded by expanding the categories of prohibited discrimination in state anti-discrimination laws.[21] In none of those states did the prohibition of sexual orientation discrimination come by judicial interpretation of a pre-existing prohibition on gender-based discrimination to encompass discrimination on the basis of sexual orientation. Similarly, the Executive Branch has prohibited discrimination against gay men and lesbians in federal employment by adding "sexual orientation" to previously protected grounds. See Exec. Order No. 13087, 63 Fed. Reg 30,097 (May 28, 1998).[22] Finally, the same approach has *153 been reflected in the repeated (but so far unsuccessful) introduction of bills in Congress to add "sexual orientation" to the list of prohibited grounds of employment discrimination in Title VII.[23]
The Department of Justice argues, relying on Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc. , --- U.S. ----, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015), that Congress ratified judicial interpretations of "sex" in Title VII as excluding sexual orientation when it amended the Civil Rights Act in 1991 and failed to overrule *154 judicial decisions holding that the sex discrimination provision of Title VII did not cover sexual orientation discrimination. See Brief of United States as Amicus Curiae 8-14. In Inclusive Communities , the Supreme Court held that disparate-impact claims are cognizable under the Fair Housing Act ("FHA"). 135 S.Ct. at 2525. In so holding, the Court found it relevant that Congress had amended the FHA after nine Courts of Appeals had held that the FHA allowed for disparate-impact claims, and did not alter the text of the Act in a way that would make it clear that disparate-impact claims were not contemplated by the FHA. Id. at 2519. Furthermore, the Court found it significant that the legislative history of the FHA amendment made it clear that Congress was aware of those Court of Appeals decisions. Id. at 2519-20. The majority dismisses this argument because at the time of the 1991 amendment to the Civil Rights Act, only three Courts of Appeals[24] had ruled that Title VII did not cover sexual orientation, and Congress did not make clear, in the legislative history of the 1991 amendment, that it was aware of this precedent. Maj. Op. at 127-28.
In light of the clear textual and historical meaning of the sex provision that I have discussed above, I do not find it necessary to rely heavily on the more technical argument that strives to interpret the meaning of statutes by congressional actions and omissions that might be taken as ratifying Court of Appeals decisions. But I do think it is worth noting that the Supreme Court also found it relevant, in Inclusive Communities , that Congress had rejected a proposed amendment "that would have eliminated disparate-impact liability for certain zoning decisions." 135 S.Ct. at 2520. Here, while only three Courts of Appeals may have ruled on the issue by 1991, over twenty-five amendments had been proposed to add sexual orientation to Title VII between 1964 and 1991. All had been rejected. In fact, two amendments were proposed in 1991, one in the House and one in the Senate, Civil Rights Amendments Act of 1991, S. 574, 102d Congress; Civil Rights Amendments Act of 1991, H.R. 1430, 102d Congress, and neither of those amendments found its way into the omnibus bill that overruled other judicial interpretations of the Civil Rights Act. Moreover, in addition to the three Courts of Appeals that had ruled on the issue, the EEOC-the primary agency charged by Congress with interpreting and enforcing Title VII-had also held, by 1991, that sexual orientation discrimination fell "outside the purview of Title VII." Dillon v. Frank , EEOC Doc. No. 01900157, 1990 WL 1111074, at *3 (Feb. 14, 1990).
Thus, to the extent that we can infer the awareness of Congress at all, the continual attempts to add sexual orientation to Title VII, as well as the EEOC's determination regarding the meaning of sex, should be considered, in addition to the three appellate court decisions, as evidence that Congress was unquestionably aware, in 1991, of a general consensus about the meaning of "because of ... sex," and of the fact that gay rights advocates were seeking to change the law by adding a new category of prohibited discrimination to the statute.
Although the Supreme Court has rightly cautioned against relying on legislative inaction as evidence of congressional intent, because "several equally tenable inferences may be drawn from such inaction, including the inference that the existing *155 legislation already incorporated the offered change," Pension Benefit Guar. Corp. v. LTV Corp. , 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (internal quotation marks omitted), surely the proposal and rejection of over fifty amendments to add sexual orientation to Title VII means something. Supra note 23. And it is pretty clear what it does not mean. It is hardly reasonable, in light of the EEOC and judicial consensus that sex discrimination did not encompass sexual orientation discrimination, to conclude that Congress rejected the proposed amendments because senators and representatives believed that Title VII "already incorporated the offered change." Pension Benefit Guar. Corp. , 496 U.S. at 650, 110 S.Ct. 2668. There may be many reasons why each proposal ultimately failed, but it cannot reasonably be claimed that the basic reason that Congress did not pass such an amendment year in and year out was anything other than that there was not yet the political will to do so.
This last point requires one further disclaimer. As with the social pre- history of Title VII, these later developments are not referenced in a dubious effort to infer the specific intentions of the members of Congress who voted for the Smith amendment in 1964, nor are they referenced to infer the specific intent of each Congress that was faced with proposed sexual orientation amendments. The point, rather, is that race, gender, and sexual orientation discrimination have been consistently perceived in the political world, and by the American population as a whole, as different practices presenting different social and political issues. At different times over the last few generations, the recognition of each as a problem to be remedied by legislation has been controversial, with the movements to define each form of discrimination as illegal developing at a different pace and for different reasons, and being opposed in each case by different coalitions for different reasons. To recognize this fact is to understand that discrimination against persons based on sex has had, in law and in politics, a meaning that is separate from that of discrimination based on sexual orientation.[25]
In short, Title VII's prohibition of employment discrimination against individuals *156 on the basis of their sex is aimed at employment practices that differentially disadvantage men vis-à-vis women or women vis-à-vis men. That is what the language of the statute means to an ordinary "fluent speaker of the English language," Hively , 853 F.3d at 363 (Sykes, J ., dissenting), that is the social practice that Congress chose to legislate against, and in light of that understanding, certain laws and practices that distinguish between men and women have been found to violate Title VII, and certain others have not. Discrimination against persons whose sexual orientation is homosexual rather than heterosexual, however offensive such discrimination may be to me and to many others, is not discrimination that treats men and women differently. The simplistic argument that discrimination against gay men and women is sex discrimination because targeting persons sexually attracted to others of the same sex requires noticing the gender of the person in question is not a fair reading of the text of the statute, and has nothing to do with the type of unfairness in employment that Congress legislated against in adding "sex" to the list of prohibited categories of discrimination in Title VII.
III
The majority opinion goes on to identify two other arguments in support of its holding: (1) that sexual orientation discrimination is actually "gender stereotyping" that constitutes discrimination against individuals based on their sex, and (2) that such discrimination constitutes prohibited "associational discrimination" analogous to discriminating against employees who are married to members of a different race.
These arguments have the merit of attempting to link discrimination based on sexual orientation to the social problem of gender discrimination at which Title VII is aimed. But just as the "differential treatment" argument attempts to shoehorn sexual orientation discrimination into the statute's verbal template of discrimination based on sex, these arguments attempt a similar (also unsuccessful) maneuver with lines of case law. While certain Supreme Court cases identify clear-cut examples of sex or race discrimination that may have a superficial similarity to the practice at issue here, the majority mistakes that similarity for a substantive one.
A
Perhaps the most appealing of the majority's approaches is its effort to treat sexual orientation discrimination as an instance of sexual stereotyping. The argument proceeds from the premises that "sex stereotyping violates Title VII," Maj. Op. at 120, and that "same-sex orientation 'represents the ultimate case of failure to conform' to gender stereotypes," id . at 121, quoting Hively , 853 F.3d at 346, and concludes that an employer who discriminates against gay people is therefore "sex stereotyping" and thus violating Title VII. But like the other arguments adopted by the majority, this approach rests more on verbal facility than on social reality.
In unpacking the majority's syllogism, it is first necessary to address what we mean by "sex stereotyping" that "violates Title VII." Invidious stereotyping of members of racial, gender, national, or religious groups is at the heart of much employment discrimination. Most employers do not entertain, let alone admit to, older forms of racialist or other discriminatory ideologies that hold that members of certain groups are inherently or genetically inferior and undeserving of equal treatment. Much more common are assumptions, not always even conscious, that associate certain negative traits with particular groups. A perception that women, for example, are not *157 suited to executive positions, or are less adept at the mathematical and practical skills demanded of engineers, can be a significant hindrance to women seeking such positions, even when a particular woman is demonstrably qualified, or indeed even where empirical data show that on average women perform as well as or better than men on the relevant tasks. Refusing to hire or promote someone because of that sort of gender (or racial, or ethnic, or religious) stereotyping is not a separate form of sex (or race, or ethnic, or religious) discrimination, but is precisely discrimination in hiring or promotion based on sex (or race, or ethnicity, or religion). It treats applicants or employees not as individuals but as members of a class that is disfavored for purposes of the employment decision by reason of a trait stereotypically assigned to members of that group as a whole. For the most part, then, the kind of stereotyping that leads to discriminatory employment decisions that violate Title VII is the assignment of traits that are negatively associated with job performance (dishonesty, laziness, greed, submissiveness) to members of a particular protected class.
Clearly, sexual orientation discrimination is not an example of that kind of sex stereotyping; an employer who disfavors a male job applicant whom he believes to be gay does not do so because the employer believes that most men are gay and therefore unsuitable. Rather, he does so because he believes that most gay people (whether male or female) have some quality that makes them undesirable for the position, and that because this applicant is gay, he must also possess that trait. Although that is certainly stereotyping, and invidiously so, it does not stereotype a group protected by Title VII, and is therefore not (yet) illegal.
But as the majority correctly points out, that is not the only way in which stereotyping can be an obstacle to protected classes of people in the workplace. The stereotyping discussed above involves beliefs about how members of a particular protected category are , but there are also stereotypes (or more simply, beliefs) about how members of that group should be . In the case of sex discrimination in particular, stereotypes about how women ought to look or behave can create a double bind. For example, a woman who is perceived through the lens of a certain "feminine" stereotype may be assumed to be insufficiently assertive for certain positions by contrast to men who, viewed through the lens of a "masculine" stereotype, are presumed more likely to excel in situations that demand assertiveness. At the same time, the employer may fault a woman who behaves as assertively as a male comparator for being too aggressive, thereby failing to comply with societal expectations of femininity.
That is the situation that a plurality of the Supreme Court identified in Price Waterhouse v. Hopkins , 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the key case the majority relies on for its "sex stereotyping" argument. As that opinion pointed out, "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." Id . at 251, 109 S.Ct. 1775. The two horns of the dilemma described in Price Waterhouse have slightly different, yet equally problematic, sexist foundations: a female employee or applicant may be prejudiced by a negative assumption that women aren't or can't be sufficiently dominant for a position that requires leadership or strength or aggression, but when a woman unquestionably *158 does show the putatively desired traits, she is held back because of the different but related notion that women shouldn't be aggressive or dominant. The latter is not an assumption about how most women are , it is a normative belief about how all women should be .
I fully accept the conclusion that that kind of discrimination is prohibited, and that it imposes different conditions of employment on men and on women. Not only does such discrimination require women to behave differently in the workplace than men, but it also actively deters women from engaging in kinds of behavior that are required for advancement to certain positions, and thus effectively bars them from such advancement. The key element here is that one sex is systematically disadvantaged in a particular workplace. In that circumstance, sexual stereotyping is sex discrimination.[26]
But as Judge Sykes points out in her Hively dissent, the homophobic employer is not deploying a stereotype about men or about women to the disadvantage of either sex. Such an employer is expressing disapproval of the behavior or identity of a class of people that includes both men and women. 853 F.3d at 370. That disapproval does not stem from a desire to discriminate against either sex, nor does it result from any sex-specific stereotype, nor does it differentially harm either men or women vis-à-vis the other sex. Rather, it results from a distinct type of objection to anyone, of whatever gender, who is identified as homosexual. The belief on which it rests is not a belief about what men or women ought to be or do; it is a belief about what all people ought to be or do-to be heterosexual, and to have sexual attraction to or relations with only members of the opposite sex. That does not make workplace discrimination based on this belief better or worse than other kinds of discrimination, but it does make it something different from sex discrimination, and therefore something that is not prohibited by Title VII.
B
The "associational discrimination" theory is no more persuasive. That theory rests on cases involving race discrimination.[27] Many courts have found that Title VII prohibits discrimination in cases in which, as in our case of Holcomb v. Iona College , 521 F.3d 130 (2d Cir. 2008), a white plaintiff alleged that he was fired because he was married to a person of a different race.
It would require absolute blindness to the history of racial discrimination in this country not to understand what is at stake in such cases, and why such allegations unmistakably state a claim of discrimination against an individual employee on the basis of race. Anti-miscegenation laws constituted a bulwark of the structure of institutional racism that is the paradigm of invidious discrimination in this country. African-Americans were condemned first to slavery, and then to second-class citizenship and virtual apartheid, on the basis of an ideology that regarded them as inferior. Such an ideology is incompatible with fraternization, *159 let alone marriage and reproduction, between African-Americans and whites. A prohibition on "race-mixing" was thus grounded in bigotry against a particular race and was an integral part of preserving the rigid hierarchical distinction that denominated members of the black race as inferior to whites.
Thus, as the Supreme Court noted in striking down Virginia's law prohibiting marriage between a white person and a person of color, the Supreme Court of Virginia had upheld the statute because Virginia defined its "legitimate" purposes as " 'preserv[ing] the racial integrity of [the state's] citizens,' and [ ] prevent[ing] 'the corruption of blood,' 'a mongrel breed of citizens,' and 'the obliteration of racial pride,' " purposes the Court correctly identified and rejected as "obviously an endorsement of the doctrine of White Supremacy." Loving v. Virginia , 388 U.S. 1, 7, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), quoting Naim v. Naim , 197 Va. 80, 87 S.E.2d 749, 756 (1955). The racist hostility to "race-mixing" extended well beyond a prohibition against interracial marriage. The beatings of "freedom riders" attempting to integrate interstate bus lines in the South in the early 1960s, inflicted on white as well as black participants in the protests, demonstrated that racial bigotry against African-Americans manifested itself in direct attacks not only on African-Americans, but also on whites who associated with African-Americans as equals. The entire system of "separate but equal" segregation in both state-owned and private facilities and places of public accommodation was designed, as Charles Black made plain in a classic deconstruction of the legal fiction of "separate but equal," to confine black people to "a position of inferiority." Charles Black, The Lawfulness of the Segregation Decision , 69 Yale L.J. 421, 424 (1960). Thus, the associational discrimination reflected in cases such as Loving and Holcomb was a product of bigotry against a single race by another. That discrimination is expressly prohibited in employment by Title VII.
Workplace equality for racial minorities is thus blatantly incompatible with a practice that ostracizes, demeans, or inflicts adverse conditions on white employees for marrying, dating, or otherwise associating with, people of color. The prohibition of that kind of discrimination is not simply a matter of noting that, in order to effectuate it, the employer must identify the races of the employee and the person(s) with whom he or she associates. Just as sexual harassment against female employees presents a serious obstacle to the full and equal participation of women in the workplace, discrimination against members of a favored race who so much as associate with persons of another race reflects a deep-seated bigotry against the disfavored race(s) that Title VII undertakes to banish from the workplace. The principle was well stated by the Sixth Circuit in a case cited by the majority, Barrett v. Whirlpool Corporation :
Title VII protects individuals who, though not members of a protected class, are victims of discriminatory animus toward protected third persons with whom the individuals associate.
556 F.3d 502, 512 (6th Cir. 2009) (internal quotation marks and brackets omitted).[28]
*160 Discrimination on the basis of sexual orientation, however, is not discrimination of the sort at issue in Holcomb and Barrett . In those cases, the plaintiffs alleged that they were discriminated against because the employer was biased-that is, had a "discriminatory animus"-against members of the race with whom the plaintiffs associated . There is no allegation in this case, nor could there plausibly be, that the defendant discriminated against Zarda because it had something against men , and therefore discriminated not only against men, but also against anyone, male or female, who associated with them. I have no trouble assuming that the principle of Holcomb and Barrett applies beyond the category of race discrimination: an employer who fired or refused to promote an Anglo-American, Christian employee because she associated with Latinos or Jews would presumably run afoul of that principle just as much as one whose animus ran against black Americans. Such an employer would clearly be discriminating against the employee on the basis of her friends' ethnicity or religion-in the formulation from the Barrett opinion, that employer would be victimizing an employee out of "discriminatory animus toward protected third persons with whom the [employee] associate[d]." 556 F.3d at 512 (internal quotation marks and alterations omitted).[29]
It is more difficult to imagine realistic hypotheticals in which an employer discriminated against anyone who so much as associated with men or with women, though I suppose academic examples of such behavior could be conjured. But whatever such a case might look like, discrimination against gay people is not it. Discrimination against gay men, for example, plainly is not rooted in animus toward "protected third persons with whom [they] associate." Id. , 556 F.3d at 512. An employer who practices such discrimination is hostile to gay men, not to men in general; the animus runs not, as in the race and religion cases discussed above, against a "protected group" to which the employee's associates belong, but against an (alas) unprotected group to which they belong: other gay men.[30]
The majority tries to rebut this straightforward distinction in various ways. First, it notes-but declines to rely on-academic "research suggesting that sexual orientation discrimination has deep misogynistic roots." Maj. Op. at 126. It is certainly plausible to me that the "deep roots" of hostility to homosexuals are in some way related to the same sorts of beliefs about the proper roles of men and women in family life that underlie at least some employment discrimination against women. See, e.g. , Andrew Koppelman, Why Discrimination Against Lesbians and Gay Men Is Sex Discrimination , 69 N.Y.U. L. Rev. 197, 234 (1994) (noting that "[i]t should be clear from ordinary experience that the stigmatization of the homosexual has something to do with the homosexual's supposed deviance from traditional sex roles") (emphasis in original). It may also be that the "roots" of all forms of discrimination against people who are different in some way from a socially defined dominant group can be found in similar psychological *161 processes of discomfort with change or difference, or with "authoritarian personality traits"[31] -or that there are other links among different forms of prejudice. And it can plausibly be argued that homosexual men have historically been derided because they were seen as abdicating their masculinity, and therefore the advantage they have over women. See, e.g. , Joseph H. Pleck, Men's Power with Women, Other Men, and Society: A Men's Movement Analysis , in The American Man 417, 424 (Elizabeth H. Pleck & Joseph H. Pleck eds., 1980).
But the majority is right not to go searching for such roots, whatever they might be, because legislation is not typically concerned, and Title VII manifestly is not concerned, with defining and eliminating the "deep roots" of biased attitudes. Congress legislates against concrete behavior that represents a perceived social problem. Title VII does not prohibit "misogyny" or "sexism," nor does it undertake to revise individuals' ideas (religious or secular) about how families are best structured. Rather, it prohibits overt acts: discrimination in hiring, promotion, and the terms and conditions of employment based on sex.[32] Similarly, states, like those in our Circuit, that have prohibited discrimination based on sexual orientation do not seek to eradicate disapproval of homosexual practices (whether rooted in religious belief or misogyny or some other theory, or caused by some conditioned or other visceral reaction). People may believe what they like, but they may not discriminate in employment against those whose characteristics or behaviors place them within the ambit of a protected category. Unlike those states, though, Congress has not enacted such a prohibition, and the fact that some of us believe that sexual orientation discrimination is unfair for much the same reasons that we disapprove of sex discrimination does not change that reality.
Second, the majority suggests that my analysis of associational discrimination is "squarely foreclosed by" cases like Oncale . Maj. Op. at 127. It is not. As noted above, I do not maintain that Title VII prohibits only those practices that its framers might have been principally concerned with, or only what was "traditionally," id ., seen as sex discrimination. To reiterate: sexual harassment plays a large role in hindering women's entry into, and advancement in, the workplace, and thus it is no surprise that courts have interpreted Title VII to prohibit it. And because Title VII protects both men and women from such practices, it does not matter whether the victim is male or female. Sexual harassment in the workplace quite literally imposes conditions of employment on one sex that are not imposed on the other, and it does not matter whether the employer who perpetrates such discriminatory disadvantage is male or female, or of the same or different sex than the employee. The victim of discrimination in such situations is selected by his or her sex, and the disadvantage is *162 imposed on him or her by reason of his or her membership in the protected class. It is not a question of what is "traditionally conceptualized as sexism." Maj. Op. at 127. It is a question of the public meaning of the words adopted by Congress in light of the social problem it was addressing when it chose those words.
C
In the end, perhaps all of these arguments, on both sides, boil down to a disagreement about how discrimination on the basis of sexual orientation should be conceptualized. Whether based on linguistic arguments or associational theories or notions of stereotyping, the majority's arguments attempt to draw theoretical links between one kind of discrimination and another: to find ways to reconceptualize discrimination on the basis of sexual orientation as discrimination on the basis of sex. It is hard to believe that there would be much appetite for this kind of recharacterization if the law expressly prohibited sexual orientation discrimination, or that any opponent of sexual orientation discrimination would oppose the addition of sexual orientation to the list of protected characteristics in Title VII on the ground that to do so would be redundant or would express a misunderstanding of the nature of discrimination against men and women who are gay. I believe that the vast majority of people in our society-both those who are hostile to homosexuals and those who deplore such hostility-understand bias against or disapproval of those who are sexually attracted to persons of their own sex as a distinct type of prejudice, and not as merely a form of discrimination against either men or women on the basis of sex.
The majority asserts that discrimination against gay people is nothing more than a subspecies of discrimination against one or the other gender. Discrimination against gay men and lesbians is wrong, however, because it denies the dignity and equality of gay men and lesbians, and not because, in a purely formal sense, it can be said to treat men differently from women. It is understandable that those who seek to achieve legal protection for gay people victimized by discrimination search for innovative arguments to classify workplace bias against gays as a form of discrimination that is already prohibited by federal law. But the arguments advanced by the majority ignore the evident meaning of the language of Title VII, the social realities that distinguish between the kinds of biases that the statute sought to exclude from the workplace from those it did not, and the distinctive nature of anti-gay prejudice. Accordingly, much as I might wish it were otherwise, I must conclude that those arguments fail.
IV
The law with respect to the rights of gay people has advanced considerably since 1964. Much of that development has been by state legislation. As noted above, for example, twenty-two states now prohibit, by explicit legislative pronouncement, employment discrimination on the basis of sexual orientation. See supra note 21. But other advances have come by means of Supreme Court decisions interpreting the Constitution. Perhaps the most striking advance, from the vantage of the early 1960s, has been the legalization of same-sex marriage as a matter of constitutional law.[33]
*163 Nothing that I have said in this opinion should be interpreted as expressing any disagreement with the line of cases running from Lawrence v. Texas , 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (invalidating criminal prohibitions of consensual sexual relations between members of the same sex), through Obergefell v. Hodges , --- U.S. ----, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015) (holding that persons of the same sex have a constitutional right to marry). But those cases provide no support for the plaintiff's position in this case, or for the method of interpretation utilized by the majority.
For one thing, it is noteworthy that none of the Supreme Court's landmark constitutional decisions upholding the rights of gay Americans depend on the argument that laws disadvantaging homosexuals constitute merely a species of the denial of equal protection of the laws on the basis of gender, or attempt to assimilate discrimination against gay people to the kinds of sex discrimination that were found to violate equal protection in cases like Frontiero v. Richardson , 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), Craig v. Boren , 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and Orr v. Orr , 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), in the 1970s.[34] Instead, the Court's gay rights cases were based on the guarantee of "liberty" embodied in the Fourteenth Amendment.
There is also a more fundamental difference. The Supreme Court's decisions in this area are based on the Constitution of the United States, rather than a specific statute, and the role of the courts in interpreting the Constitution is distinctively different from their role in interpreting acts of Congress. There are several reasons for this.
First, the entire point of the Constitution is to delimit the powers that have been granted by the people to their government. Our Constitution creates a republican form of government, in which the democratically elected representatives of the majority of the people are granted the power to set policy. But the powers of those representatives are constrained by a written text, which prevents a popular majority-both in the federal Congress and, since the Civil War Amendments, in state legislatures-from violating certain fundamental rights. As every law student reads in his or her first-year constitutional law class, "[t]he powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." Marbury v. Madison , 1 Cranch 137, 176, 2 L.Ed. 60 (1803). To the extent that the courts exercise a non-democratic or counter-majoritarian power, they do so in the name of those rights. See City of Richmond v. J.A. Croson Co. , 488 U.S. 469, 495, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (quoting United States v. Carolene Products , 304 U.S. 144, 153 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) to explain that "one aspect of the judiciary's role under the Equal Protection Clause is to protect 'discrete and insular minorities' from majoritarian prejudice or indifference"). Particular exercises of that power, including the gay rights decisions of this new millennium, may be controversial, *164 and fierce disagreements exist over the legitimacy of various methods of constitutional interpretation. And it is not controversial that the power to assess the constitutionality of legislation must be exercised with restraint, and with a due deference to the judgments of elected officials who themselves have taken an oath to defend the Constitution. But it has long been generally accepted that the courts have a special role to play in defending the liberties enshrined in the Constitution against encroachment even by the people's elected representatives. See City of Boerne v. Flores , 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (explaining that "Congress' discretion [to enact legislation] is not unlimited, however, and the courts retain the power, as they have since Marbury v. Madison , to determine if Congress has exceeded its authority under the Constitution").
Within the limits imposed by constitutional principles, however, the will of the majority, as expressed in legislation adopted by the people's representatives, governs. As the Supreme Court has instructed, the role of courts with respect to statutes is simply "to apply the statute as it is written-even if we think some other approach might accord with good policy." Sandifer v. U.S. Steel Corp ., --- U.S. ----, 134 S.Ct. 870, 878, 187 L.Ed.2d 729 (2014), quoting Burrage v. United States , --- U.S. ----, 134 S.Ct. 881, 892, 187 L.Ed.2d 715 (2014). Just last Term, a unanimous Supreme Court foreclosed judicial efforts to "update" statutes, declaring that, although "reasonable people can disagree" whether, following the passage of time, "Congress should reenter the field and alter the judgments it made in the past[,] ... the proper role of the judiciary in that process ... [is] to apply, not amend, the work of the People's representatives." Henson v. Santander Consumer USA Inc. , --- U.S. ----, 137 S.Ct. 1718, 1725-26, 198 L.Ed.2d 177 (2017). In interpreting statutes, courts must not merely show deference or restraint; their obligation is to do their best to understand, in a socially and politically realistic way, what decisions the democratic branches of government have embodied in the language they voted for (and what they have not), and to interpret statutes accordingly in deciding cases.
Second, the rights conferred by the Constitution are written in broad language. As the great Chief Justice Marshall commented, our Constitution is "one of enumeration, and not of definition." Gibbons v. Ogden , 22 U.S. (9 Wheat.) 1, 72, 6 L.Ed. 23 (1824). Examples are easily cited: The Constitution does not contain a list of specific punishments that are too cruel to be imposed; it prohibits, in general language, "cruel and unusual punishments." U.S. Const. amend. VIII. It does not enact a code of police procedure that explains exactly what kinds of searches the police may conduct, under what particular circumstances; it prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. It does not, as relevant here, identify particular types of discriminatory actions by state governments that it undertakes to forbid; it demands that those governments provide to all people within our borders "the equal protection of the laws." U.S. Const. amend. XIV.
Legislation, in contrast, can and often does set policy in minute detail. It does not necessarily concern itself with deep general principles. Rather, legislators are entitled to pick and choose which problems to address, and how far to go in addressing them. Within the limits of constitutional guarantees, Congress is given "wide latitude" to legislate, City of Boerne , 521 U.S. at 520, 117 S.Ct. 2157, but courts must struggle to define those limits by giving coherent meaning to broad constitutional principles. The majestic guarantee of equal *165 protection in the Fourteenth Amendment is a very different kind of pronouncement than the prohibition, in Title VII, of specific kinds of discrimination, by a specified subset of employers, based on clearly defined categories. The language of the Constitution thus allows a broader scope for interpretation.
Third, and following in part from above, the Constitution requires some flexibility of interpretation, because it is intended to endure; it was deliberately designed to be difficult to amend.[35] It is difficult to amend because the framers believed that certain principles were foundational and, for practical purposes, all but eternal, and should not be subject to the political winds of the moment. A constitution is, to quote Chief Justice Marshall yet again, "framed for ages to come, and is designed to approach immortality as nearly as human institutions can approach it." Cohens v. State of Virginia , 19 U.S. (6 Wheat.) 264, 387, 5 L.Ed. 257 (1821). The choice of broad language reflects the framers' goal: they did not choose to prohibit "cruel and unusual punishments," rather than listing prohibited punishments, simply to save space, on the assumption that future courts could consult extra-constitutional sources to identify what particular penalties they had in mind; they did so in order to enshrine a general principle, leaving its instantiation and elaboration to future interpreters.
Those enduring principles would not, could not, endure if they were incapable of adaptation-at times via judicial interpretation-to new social circumstances, as well as new understandings of old problems. That idea is not new. In 1910, the Supreme Court wrote, in the context of the Eighth Amendment, that "[t]ime works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions." Weems v. United States , 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793 (1910). More recently, in Obergefell , the Court noted that "in interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." 135 S.Ct. at 2603.
Legislation, on the other hand, is not intended to last forever. It must be consistent with constitutional principles, and ideally it will be inspired by a principled concept of ordered liberty. But it nevertheless remains the domain of practical political compromise. Congress and the state legislatures are in frequent session, and are capable-notwithstanding criticisms of "gridlock" and praise of "checks and balances"-of acting to repeal, extend, or modify prior enactments. In interpreting the Constitution, courts speak to the ages; in interpreting legislation, federal courts speak to-and essentially for-Congress, which can always correct our mistakes, or revise legislation in light of changing political and social realities.
Finally, the Constitution, as noted above, is designed, with very limited exceptions,[36] to govern the government. The *166 commands of equal protection and respect for liberties that can only be denied by due process of law tell us how a government must behave when it regulates the people who created it. Legislation, however, generally governs the people themselves, in their relation with each other.
The question of how the government, acting at the behest of a possibly temporary political majority, is permitted to treat the people it governs, is a different question, and is answered by reference to different principles, than the question of what obligations should be imposed on private citizens. The former question must ultimately be answered by courts under the principles adopted in the Constitution. The latter is entrusted primarily to the legislative process. Courts interpreting statutes are not in the business of imposing on private actors new rules that have not been embodied in legislative decision. It is for that reason that segregation in public facilities was struck down by constitutional command, long before segregation of private facilities was prohibited by federal legislation adopted by Congress. Whether or not the Fifth and Fourteenth Amendments have something to say about whether the state and federal governments may discriminate in employment against gay Americans-a question that is not before us, and about which I express no view-it is the prerogative of Congress or a state legislature to decide whether private employers may do so.
In its amicus submission, the EEOC quite reasonably asks whether it is just that a gay employee can be married on Sunday, and fired on Monday-discriminated against at his or her job for exercising a right that is protected by the Constitution. Brief of the Equal Employment Opportunity Commission as Amicus Curiae 22.[37] I would answer that it is not just. But at the same time, I recognize that the law does not prohibit every injustice. The Constitution protects the liberty of gay people to marry against deprivation by their government, but it does not promise freedom from discrimination by their fellow citizens. That is hardly a novel proposition: absent Title VII, the same injustice could have been inflicted on the Loving s themselves. The Constitution protected them against governmental discrimination, but (except for specific vestiges of slavery prohibited by the Thirteenth Amendment) only an act of Congress can prohibit one individual from discriminating against another in housing, public accommodations, and employment. It is well to remember that whether to prohibit race and sex discrimination was a controversial political question in 1964. Imposing an obligation on private employers to treat women and minorities fairly required political organizing and a political fight.
At the end of the day, to paraphrase Chief Justice Marshall, in interpreting statutes we must never forget that it is not a Constitution we are expounding. Cf. M'Culloch v. Maryland , 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819). When interpreting an act of Congress, we need to respect the choices made by Congress about which social problems to address, and how to address them. In 1964, Congress-belatedly-prohibited employment discrimination based on race, sex, religion, ethnicity, and national origin. Many states have similarly recognized the injustice of discrimination on the basis of sexual orientation.
*167 In doing so, they have called such discrimination by its right name, and taken a firm and explicit stand against it. I hope that one day soon Congress will join them, and adopt that principle on a national basis. But it has not done so yet.
For these reasons, I respectfully, and regretfully, dissent.[38]
Debra Ann Livingston, Circuit Judge, dissenting:
I dissent for substantially the reasons set forth in Sections I, II, and III of Judge Lynch's opinion, and I join in those sections. I share in the commitment that all individuals in the workplace be treated fairly, and that individuals not be subject to workplace discrimination on the basis of their sexual orientation, just as on the basis of their "race, color, religion, sex, [and] national origin." I cannot conclude, however, as the majority does, that sexual orientation discrimination is a "subset" of sex discrimination, Maj. Op. at 112-13, 114 n.10, 119, 119-20, et passim, and is therefore included among the prohibited grounds of workplace discrimination listed in Title VII.[1]
The majority's efforts founder on the simple question of how a reasonable reader, competent in the language and its use, would have understood Title VII's text when it was written-on the question of its public meaning at the time of enactment. The majority acknowledges the argument "that it is not 'even remotely plausible that in 1964, when Title VII was adopted, a reasonable person competent in the English language would have understood that a law banning employment discrimination 'because of sex' also banned discrimination because of sexual orientation.' " Id. at 114 (citation omitted). It does not contest the point, however, but seeks merely to justify its departure from ordinary, contemporary meaning by claiming that "[e]ven if that [is] so," its approach no more departs from the ordinary meaning of words in their contemporary context than supposedly occurred when sexual harassment and hostile work environment claims were first recognized by courts. Id. at 114-15. But as Judge Lynch has cogently explained, that is simply not the case. Dissenting Op. at 144-47. The majority does not discover a "plain" yet hidden meaning in Title VII, sufficiently obscure as to wholly elude every appellate court, including this one, until the Seventh Circuit's decision in Hively v. Ivy Tech Cmty. Coll. of Ind. , 853 F.3d 339 (7th Cir. 2017) (en banc), last year. Instead, it sub silentio abandons our usual approach to statutory interpretation. See, e.g. , Sandifer v. U.S. Steel Corp. , --- U.S. ----, 134 S.Ct. 870, 876, 187 L.Ed.2d 729 (2014) (noting the " 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning' " (quoting Perrin v. United States , 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) ) ); Bilski v. Kappos , 561 U.S. 593, 603, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) (quoting Perrin and applying the same canon of statutory interpretation); Diamond v. Diehr , 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (same).
Because Sections I, II, and III of Judge Lynch's dissent are sufficient to answer the statutory question that this case presents, *168 I do not go further to address the subject of constitutional interpretation, and do not join in Section IV. I agree with Judge Lynch, however, that constitutional and statutory interpretation should not be confused: that while courts sometimes may be called upon to play a special role in defending constitutional liberties against encroachment by government , in statutory interpretation, courts "are not in the business of imposing on private actors new rules that have not been embodied in legislative decision." Dissenting Op. at 166. To do so chips away at the democratic and rule-of-law principles on which our system of governance is founded-the very principles we rely on to secure the legitimacy and the efficacy of our laws, including antidiscrimination legislation.[2]
The Supreme Court said unanimously, just last Term, that the proper role of the judiciary in statutory interpretation is "to apply, not amend, the work of the People's representatives," even when reasonable people might believe that "Congress should reenter the field and alter the judgments it made in the past." Henson v. Santander Consumer USA Inc. , --- U.S. ----, 137 S.Ct. 1718, 1725-26, 198 L.Ed.2d 177 (2017). "[I]t is for Congress, not the courts, to write the law," Stanard v. Olesen , 74 S.Ct. 768, 771, 98 L.Ed. 1151 (1954), and where "Congress' ... decisions are mistaken as a matter of policy, it is for Congress to change them. We should not legislate for them[,]" Herb's Welding, Inc. v. Gray , 470 U.S. 414, 427, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985) (citing Victory Carriers, Inc v. Law , 404 U.S. 202, 216, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971) ).
This hornbook separation-of-powers principle and the reasons behind it need not be elaborated here, for both should be well known to every law student. See The Federalist No. 47 , at 251-52 (James Madison) (Carey & McClellan eds., 2001) (quoting Montesquieu to the effect that "were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator"); see also I.N.S. v. Chadha , 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (noting that "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted"). Together, they explain why judges interpreting statutes do their best to discern the ordinary, contemporary, common meaning of the statute's language. This is the law that was enacted through the democratic process, and the law we are to apply.
This approach does not always yield results that satisfy the judge charged with the task of statutory interpretation. It has not done so today. But I cannot faithfully join in the majority's opinion. I agree with Judge Lynch that when Title VII was written and, indeed, today, "bias against or disapproval of those who are sexually attracted to persons of their own sex" was and is viewed "as a distinct type of prejudice," and not as a subcategory of "discrimination against either men or women on the basis of sex." Dissenting Op. at 162. Accordingly, and agreeing with him that in interpreting an act of Congress, we must "respect the choices made by Congress about which social problems to address, *169 and how to address them," id. at 166, I respectfully dissent.

In fact, many civil rights and women's rights organizations were reluctant to support gay rights. See, e.g. , Bhaskar A. Shukla, Feminism: From Mary Wollstonecraft to Betty Friedan 111 (2007) (describing how Betty Friedan had opposed "equating feminism with lesbianism," and is said to have coined the anti-lesbian phrase "Lavender Menace" during a 1969 National Organization for Women meeting). Similarly, some civil rights leaders were uncomfortable with according public prominence to Bayard Rustin, a gay black man, despite his formidable organizing skills. Rustin was a leading strategist of the civil rights movement, and was the chief organizer of the 1963 March on Washington. John D'Emilio, Lost Prophet: The Life and Times of Bayard Rustin 2-3 (2003). Although Rustin spent most of his life fighting for civil rights for African-Americans, "[p]rejudice of another sort, still not named as such in mid century America, had curtailed his opportunities and limited his effectiveness."Id. at 326-27 (2003).

For example, at the ACLU's Biennial Conference in 1964, in a speech tellingly titled "Civil Liberties and the War on Crime," activist lawyer Harriet Pilpel advocated a constitutionally protected right to privacy as a necessary corrective to the civil liberties abuses perpetuated by laws "relating to birth control, abortion, compulsory sterilization, prostitution, miscegenation, homosexuality, fornication and adultery." Allison Day, Guiding Griswold: Reevaluating National Organizations' Role in the Connecticut Birth Control Cases , 22 Cardozo J. L. & Gender 191, 216-18 & n.204 (2016) ; see also Samuel Walker, In Defense of American Liberties: A History of the ACLU 312 (1990) (crediting Pilpel's speech as the first substantive introduction of gay rights to the ACLU's agenda). Pilpel's argument was not based on equal protection, and made no claim that the criminalization of same-sex relations constituted a form of sex discrimination or gender bias.

By contrast, by the early 1970s, when Congress finally got around to proposing the Equal Rights Amendment ("ERA") for ratification, gay issues were at least on the radar screen, albeit only as a talking point of opponents that was quickly disavowed by the ERA's supporters. Senator Sam Ervin, who opposed the ERA, purported to be concerned that its broad language might invalidate laws that "make homosexuality a crime or ... [require states to recognize] the right of a man to marry another man or the right of a woman to marry a woman." 118 Cong. Rec. 9,315 (1972). Senator Birch Bayh, the chief sponsor of the ERA, hastened to deny that the Amendment would have any such effect, reassuring the Senate that the ERA would require only that "if a State legislature makes a judgment that it is wrong for a man to marry a man, then it must say it is wrong for a woman to marry a woman." Id . at 9,331.

In the years immediately following the enactment of Title VII, however, even certain prominent officials charged with enforcing it seemed to take the opposite approach, interpreting the statute, insofar as it prohibited sex discrimination, in the light of the presumed prejudices of those who adopted it. Franklin Roosevelt, Jr., the first chair of the Equal Employment Opportunity Commission, believed that the ban on sex discrimination was an inadvertent add-on, and as a result need not be enforced as strictly as the prohibition on racial discrimination. When asked, at his first press conference as head of the EEOC, "What about sex?" Roosevelt responded, "Don't get me started. I'm all for it." Thomas, supra , at 4. One of the agency's first executive directors, Herman Edelsberg, was no better, dismissing the provision as a "fluke" that was "conceived out of wedlock." Id.

Despite my explicit clarity about this point, both the majority, see Maj. Op. at 115 (characterizing "reliance on the principal concern of our legislators" as "the centerpiece of the dissent's statutory analysis") (internal quotation marks omitted), and Judge Lohier's concurrence, see Lohier, J. Concurring Op. at 137 (characterizing this opinion as a "call ... to consider what the legislature would have decided if the issue had occurred to the legislators at the time of enactment"), fail to grasp it. As the text above makes plain, I do not contend that Title VII is limited by what members of Congress who voted for it privately believed or intended to prohibit, or might have hoped it would or would not do. The question here is what "discriminate against any individual ... because of such individual's ... sex," 42 U.S.C. § 2000e-2(a)(1), as contrasted to "discriminate against any individual ... because of such individual's ... sexual orientation," meant (and continues to mean) to ordinary speakers of English. Legislation cannot sensibly be interpreted by stringing together dictionary synonyms of each word and proclaiming that, if the right example of the meaning of each is selected, the "plain meaning" of the statute leads to a particular result. No theory of interpretation, including textualism itself, is premised on such an approach. (No less a textualist than Justice Scalia recognized the point: "Adhering to the fair meaning of the text ... does not limit one to the hyperliteral meaning of each word in the text." Antonin Scalia and Bryan A. Garner, Reading Law 356 (2012) (emphasis in original).) That is because the political and social context of the words is critical to understanding what it is that the political branches of our government wrote into law. (Justice Scalia again: Because most common English words "have a number of dictionary definitions," a court should ordinarily "assume the contextually appropriate ordinary meaning." Id . at 70 (emphasis added).)

As the Supreme Court has repeatedly instructed, "[i]t is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.' " Sandifer v. U.S. Steel Corp ., --- U.S. ----, 134 S.Ct. 870, 876, 187 L.Ed.2d 729 (2014), quoting Perrin v. United States , 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). It is worth noting, moreover, that, because legislation is a fundamentally political process, the political context of legislation, and the way in which language is (or is not ) used in the public debate over proposed legislation, can be useful in understanding that meaning.

The majority agrees, at least "arguendo ." Maj. Op. at 107 n.2. Issues about how to define who falls into which gender, or whether the division of humanity into two sexes or genders is oversimplified as applied to persons who identify as transgender or gender fluid or bigendered are not before us today, and neither the majority nor the plaintiffs nor their amici contend that gay and lesbian individuals constitute a third or fourth sex. Cf. Hively , 853 F.3d at 355 (Posner, J. , concurring) ("It's true that even today if asked what is the sex of plaintiff Hively one would answer that she is female or that she is a woman, not that she is a lesbian. Lesbianism denotes a form of sexual or romantic attraction; it is not a physical sex identifier like masculinity or femininity.").

As we have recently been reminded, too many powerful men continue to engage in such practices. See , e.g. , J.M.F., What is Sexual Harassment and How Prevalent Is It? , The Economist (Nov. 24, 2017), https://www.economist.com/blogs/economist-explains/2017/11/economist-explains-17 (writing that "[i]n recent months myriad women have detailed the sexual harassment and assault they have experienced in ... Hollywood, Silicon Valley, politics, the media, the armed forces, [and] academia").

Indeed, the overt objectification of female employees was highlighted in debates immediately following the enactment of Title VII. One industry notorious for sexualizing women was the airline industry, which hired only young, attractive women to serve as flight attendants. Stephanie Coontz, A Strange Stirring: The Feminine Mystique and American Women at the Dawn of the 1960s 9-10 (2011). Flight attendants were forced to retire upon marriage, or, if they did not marry, once they reached their early thirties because, as one airline official commented, "the average woman's appearance has markedly deteriorated at this age." Id. at 10. In 1965, responding to public (male) commentary lamenting the idea that Title VII might mean an end to the practice of hiring only female flight attendants, Representative Martha Griffiths remarked, "If you are trying to run a whorehouse in the sky, get a license." Menand, supra .

The text of the sex provision, as well as the principle of equal treatment of both sexes makes it as obvious that the less-frequently encountered situation of sexual harassment of male employees, whether by men or by women, must also be included in Title VII's prohibitions. See Newport News Shipbuilding & Dry Dock Co. v. EEOC , 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (noting that under Title VII, "[m]ale as well as female employees are protected against discrimination"); see also Oncale v. Sundowner Offshore Servs., Inc. , 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that "nothing in Title VII necessarily bars a claim of discrimination 'because of ... sex' merely because the plaintiff and the defendant ... are of the same sex").

The quoted statement from Huntington is actually a parenthetical squib glossing a citation to Griggs v. Duke Power Co. , 401 U.S. 424, 429-36, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and summarizing the import of a lengthy discussion in that seminal Supreme Court decision; Huntington itself concerned the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, codified at 42 U.S.C. §§ 3601 -3631. Huntington , 844 F.2d at 928.

Indeed, Judge Cabranes's concurring opinion suggests that that interpretation is so obvious and straightforward that nothing more need be said on the subject, and that we can dispense with the various arguments from precedent and principle that the majority opinion makes in support of its holding. Cabranes, J. , Concurring Op. at 135. But that interpretation, in fact, is anything but obvious.

The majority's reliance on a footnote in Price Waterhouse does nothing to change this fact. Maj. Op. at 123-24. The majority quotes the portion of the footnote stating that Title VII "on its face treats each of the enumerated categories exactly the same," and that the "principles ... announce[d]" by the Price Waterhouse Court with regard to gender "apply with equal force to discrimination based on race, religion, or national origin," to support its conclusion that the associational discrimination cases that have arisen in the context of race should also apply to associational discrimination in terms of gender. Price Waterhouse v. Hopkins , 490 U.S. 228, 243 n.9, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). While I explain my disagreement with this argument below, it is worth noting here why this footnote does not change the above analysis. The Court in Price Waterhouse did not state that every decision with regard to one enumerated group in Title VII must be applied blindly to every other group. Rather, it emphasized that the "principles" embedded in Title VII should apply with equal force to each enumerated category. Id . It is those principles that have allowed courts to interpret the various prohibitions in Title VII "against the background of ... the historical context from which the Act arose," United Steelworkers of Am., AFL-CIO-CLC v. Weber , 443 U.S. 193, 201, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), in upholding distinctions between sexes that would unquestionably be rejected if made between races. And it is the principle of equal opportunity animating Title VII that I have attempted to distill in this opinion.

That of course does not mean that "discriminate against" has any different meaning as applied to "because of ... race" than it does as applied to "because of ... sex." What it means is that similar, or even identical, practices may have a different social meaning and a different economic effect when they distinguish male from female employees than when they distinguish white from black employees.

Despite the Times's concerns, the Rockettes remain all female more than 50 years after Title VII became law, and the owners of franchises in the Women's National Basketball Association are likely not very worried about losing a lawsuit by men who were not allowed to try out for employment with their teams. Needless to say, dance troupes or professional sports leagues that employed only whites or blacks would be quite a different matter.

To spell the point out: life expectancy, see Maj. Op. at 116-17, citing L.A. Dep't of Water & Power v. Manhart , 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), may be quite literally a mathematical "function of sex," to the extent that with knowledge of a person's sex, one can calculate his or her life expectancy, which will differ from that of a member of the opposite sex. Whatever the majority means by its assertion that "sexual orientation is a function of sex," Maj. Op. at 119, it plainly does not mean anything like that.

Although empirical data are hard to come by, there appears to be nothing to suggest that rates of homosexuality differ significantly between men and women. See, e.g. , Gary J. Gates, In U.S., More Adults Identifying as LGBT , Gallup (Jan. 11, 2017), http://news.gallup.com/poll/201731/lgbt-identification-rises.aspx.

Of course, discrimination against a subcategory of members of one sex is also prohibited by Title VII. An employer that hires gay men but refuses to hire lesbians, or vice versa, would thus be in violation of the statute.

See Cal. Gov't Code § 12940 (California); Colo. Rev. Stat. § 24-34-402 (Colorado); Conn. Gen. Stat. § 46a-60 (Connecticut); Del. Code Ann. tit. 19, § 711 (Delaware); D.C. Code § 2-1402.11 (District of Columbia); Haw. Rev. Stat. § 378-2 (Hawaii); 775 Ill. Comp. Stat. 5/2-101, 102 (Illinois); Iowa Code § 216.6 ; Me. Rev. Stat. tit. 5, § 4571 (Maine) ; Md. Code Ann., State Gov't § 20-606 (Maryland); Mass. Gen. Laws ch. 151B, § 4 (Massachusetts); Minn. Stat. § 363A.08 (Minnesota); Nev. Rev. Stat. § 613.330 (Nevada); N.H. Rev. Stat. Ann. § 354-A:7 (New Hampshire); N.J. Stat. Ann. § 10:5-4 (New Jersey); N.M. Stat. Ann. § 28-1-7 (New Mexico); N.Y. Exec. Law § 296 (New York); Or. Rev. Stat. § 659A.003 (Oregon); R.I. Gen. Laws § 28-5-7 (Rhode Island); Vt. Stat. Ann. tit. 21, § 495 (Vermont); Wash. Rev. Code § 49.60.180 (Washington); Wis. Stat. § 111.321 (Wisconsin).

Discrimination in federal employment on the basis of sex (as well as race, color, religion, and national origin) has been prohibited by executive order since 1969. See Exec. Order No. 11478, 34 Fed. Reg. 12,985 (Aug. 8, 1969). In 1998, the Clinton Administration did not argue that the prohibition of sex discrimination in that Order already banned, or henceforth would be deemed to ban, sexual orientation discrimination; rather, like the states that have prohibited such discrimination by all employers, it straightforwardly added sexual orientation to the prohibited categories. See Exec. Order No. 13087.

See Civil Rights Amendments Act, H.R. 166, 94th Cong. (1975); A Bill to Prohibit Discrimination on the Basis of ... Sexual Preference, H.R. 2667, 94th Cong. (1975); Civil Rights Amendments, H.R. 5452, 94th Cong. (1975); Civil Rights Amendments, H.R. 13019, 94th Cong. (1976); Civil Rights Amendments, H.R. 451, 95th Cong. (1977); Civil Rights Amendments Act, H.R. 7775, 95th Cong. (1977); Civil Rights Amendments, H.R. 2998, 95th Cong. (1977); Civil Rights Amendments Act of 1977, H.R. 4794, 95th Cong. (1977); Civil Rights Amendments Act of 1977, H.R. 5239, 95th Cong. (1977); Civil Rights Amendments Act of 1977, H.R. 8269, 95th Cong. (1977); Civil Rights Amendments Act of 1979, H.R. 2074, 96th Cong. (1979); A Bill to Prohibit Employment Discrimination on the Basis of Sexual Orientation, S. 2081, 96th Cong. (1979); Civil Rights Amendments Act of 1981, H.R. 1454, 97th Cong.; Civil Rights Amendments Act of 1981, H.R. 3371, 97th Cong.; A Bill to Prohibit Discrimination on the Basis of Sexual Orientation, S. 1708, 97th Cong. (1981); A Bill to Prohibit Employment Discrimination on the Basis of Sexual Orientation, S. 430, 98th Cong. (1983); Civil Rights Amendments Act of 1983, H.R. 427, 98th Cong.; Civil Rights Amendments Act of 1983, H.R. 2624, 98th Cong.; Civil Rights Amendments Act of 1985, S. 1432, 99th Cong.; Civil Rights Amendments Act of 1985, H.R. 230, 99th Cong.; Civil Rights Amendments Act of 1987, S. 464, 100th Cong.; Civil Rights Amendments Act of 1987, H.R. 709, 100th Cong.; Civil Rights Protection Act of 1988, S. 2109, 100th Cong.; Civil Rights Amendments Act of 1989, S. 47, 101st Cong.; Civil Rights Amendments Act of 1989, H.R. 655, 101st Cong.; Civil Rights Amendments Act of 1991, S. 574, 102d Cong.; Civil Rights Amendments Act of 1991, H.R. 1430, 102d Cong.; Civil Rights Amendments Act of 1993, H.R. 423, 103d Cong.; Employment Nondiscrimination Act of 1994, S. 2238, 103d Cong.; Civil Rights Act of 1993, H.R. 431, 103d Cong.; Employment Non-Discrimination Act of 1994, H.R. 1430, 103d Cong.; Civil Rights Amendments Act of 1995, H.R. 382, 104th Cong.; Employment Non-Discrimination Act of 1995, S. 932, 104th Cong.; Employment Non-Discrimination Act of 1995, H.R. 1863, 104th Cong.; Civil Rights Amendments Act of 1998, H.R. 365, 105th Cong.; Employment Non-Discrimination Act of 1997, S. 869, 105th Cong.; Employment Non-Discrimination Act of 1997, H.R. 1858, 105th Cong.; Civil Rights Amendments Act of 1999, H.R. 311, 106th Cong.; Employment Non-Discrimination Act of 1999, S. 1276, 106th Cong.; Employment Non-Discrimination Act of 1999, H.R. 2355, 106th Cong.; Civil Rights Amendments Act of 2001, H.R. 217, 107th Cong.; Employment Non-Discrimination Act of 2001, H.R. 2692, 107th Cong.; Employment Non-Discrimination Act of 2002, S. 1284, 107th Cong.; Equal Rights and Equal Dignity for Americans Act of 2003, S. 16, 108th Cong.; Employment Non-Discrimination Act of 2003, H.R. 3285, 108th Cong.; Employment Non-Discrimination Act of 2003, S. 1705, 108th Cong.; Civil Rights Amendments Act of 2005, H.R. 88, 109th Cong.; Employment Non-Discrimination Act of 2007, H.R. 2015, 110th Cong.; Employment Non-Discrimination Act of 2007, H.R. 3685, 110th Cong.; Employment Non-Discrimination Act of 2009, H.R. 3017, 111th Cong.; Employment Non-Discrimination Act of 2009, H.R. 2981, 111th Cong.; Employment Non-Discrimination Act of 2009, S. 1584, 111th Cong.; Employment Non-Discrimination Act, H.R. 1397, 112th Cong. (2011); Employment Non-Discrimination Act of 2011, S. 811, 112th Cong.; Employment Non-Discrimination Act of 2013, H.R. 1755, 113th Cong.; Employment Non-Discrimination Act of 2013, S. 815, 113th Cong.; Equality Act, H.R. 3185, 114th Cong. (2015); Equality Act, S. 1858, 114th Cong. (2015).

Williamson v. A.G. Edwards and Sons, Inc. , 876 F.2d 69 (8th Cir. 1989) ; DeSantis v. Pac. Telephone and Telegraph Co., Inc. , 608 F.2d 327 (9th Cir. 1979) ; Blum v. Gulf Oil Corp. , 597 F.2d 936 (5th Cir. 1979).

This is by no stretch of the imagination an outlier position, past or present. As the majority recognizes, until just last year, when the Seventh Circuit decided Hively, 853 F.3d at 340, this interpretation of the sex provision prevailed, unanimously, in federal courts of appeals nationwide. Maj. Op. at 107-08 (citing the "consensus among our sister circuits" that "because of ... sex" did not cover sexual orientation, and listing eight Court of Appeals decisions so holding). Specifically, eleven Circuit Courts, including ours, had considered the question, and all had concluded that, by its terms, Title VII does not prohibit sexual orientation discrimination. See Higgins v. New Balance Athletic Shoe, Inc. , 194 F.3d 252, 259 (1st Cir. 1999) ; Dawson v. Bumble & Bumble , 398 F.3d 211, 217-18 (2d Cir. 2005) ; Bibby v. Phila. Coca Cola Bottling Co. , 260 F.3d 257, 261 (3d Cir. 2001) ; Wrightson v. Pizza Hut of Am., Inc. , 99 F.3d 138, 143 (4th Cir. 1996) ; Blum v. Gulf Oil Corp. , 597 F.2d 936, 938 (5th Cir. 1979) ; Kalich v. AT & T Mobility, LLC , 679 F.3d 464, 471 (6th Cir. 2012) ; Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc. , 224 F.3d 701, 708 (7th Cir. 2000) ; Williamson v. A.G. Edwards & Sons, Inc. , 876 F.2d 69, 70 (8th Cir. 1989) ; DeSantis , 608 F.2d at 329-30 ; Medina v. Income Support Div. , 413 F.3d 1131, 1135 (10th Cir. 2005) ; Evans v. Georgia Reg'l Hosp. , 850 F.3d 1248, 1255 (11th Cir. 2017). As noted above, the EEOC had also concluded that sexual orientation fell "outside the purview of Title VII." Dillon , 1990 WL 1111074, at *3. It was not until 2015 that the EEOC ruled, for the first time, that Title VII should be interpreted to cover sexual orientation, Baldwin v. Foxx , EEOC Decision No. 0120133080, 2015 WL 4397641, at *5 (July 15, 2015), and its position is opposed by the Department of Justice, which also has responsibility for enforcing statutes prohibiting sex discrimination. See Brief of the United States as Amicus Curiae 1.

The same type of discrimination could affect men in a job environment in which stereotypically "feminine" traits such as empathy are required. On the authority of Price Waterhouse , Title VII would prohibit an employer from discriminating against male social workers in hiring or promotion either based on a stereotypical assumption that men are in general insufficiently caring or because of a prejudice against men who do display such putatively feminine qualities.

Other than the Seventh Circuit's decision in Hively , 853 F.3d at 347-49, no federal appellate court has applied this theory outside of the context of racial discrimination cases.

The majority quotes this passage from Barrett , italicizing "protected class," in an effort to suggest that the Sixth Circuit, like the Seventh, has applied this principle to sex discrimination. Maj. Op. at 124. It has not. Barrett was a race discrimination case. To the extent that the formulation used could be read to extend beyond race, it is dictum. As will be made clear momentarily, it is not dictum to which I object, but it is one that, properly understood, has no application to the present case.

Furthermore, the principle that prohibitions against discrimination equally protect members of the socially dominant group in situations in which they are victims of discrimination would apply the same rule to a Jewish or black employer who discriminated against Jewish or black employees who married or associated with Christians or whites.

The majority twits "[c]ertain amici " for failing to offer "empirical support" for a comparable assertion. Maj. Op. at 126. I doubt that a fair-minded reader needs any for the proposition I have stated.

Sociologists have theorized that individuals with authoritarian personalities are most likely to be prejudiced against marginalized groups because they are rigid thinkers who obey authority, see the world as black and white, and enforce strict adherence to social hierarchies. Theodor W. Adorno et al., The Authoritarian Personality 228 (1st ed. 1950).

This is not to deny that such legislation may be supported in part by the hope that once individuals from different backgrounds have occasion to interact with one another, they will see beyond stereotypes and preconceived notions about how an entire class of people "is," and the ignorance and bigotry that initially motivated discrimination will be lessened. But any such purpose cannot warrant extending the categories of discrimination that Congress has outlawed to any other category that shares similar "roots" to prohibited practices.

Both the majority, see Maj. Op. at 131 n.33, and Judge Sack, see Concurring Op. of Sack, J. , at 135, cite these dramatic, and to me welcome, changes in the law. But these changes, both legislative and constitutional, stem from changes in social attitudes toward gay people, not from any change in, or improved understanding of, the meaning of "sex discrimination."

That is particularly noteworthy given that one of the pioneering academic assertions of a right to same-sex marriage argued that the prohibition of discrimination based on sex in the Equal Rights Amendment (then before the states for ratification) would invalidate laws prohibiting same-sex marriage. Note, The Legality of Homosexual Marriage , 82 Yale L.J. 573, 583-88 (1973).

Scholars have noted that an exceedingly small fraction of the population could conceivably block ratification of a constitutional amendment, despite overwhelming majority support for such an amendment. See, e.g. , Akhil Reed Amar, Philadelphia Revisited: Amending the Constitution Outside Article V , 55 U. Chi. L. Rev. 1043, 1060 (1988).

A significant exception is the Thirteenth Amendment, which "[b]y its own unaided force ... abolished slavery, and established universal freedom." Civil Rights Cases , 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835 (1883) ; see Jones v. Alfred H. Mayer Co. , 392 U.S. 409, 437-44, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (explaining that the Amendment reaches, and authorizes Congress to reach in implementing legislation, private conduct).

The majority notes the same "paradox." Maj. Op. at 131 n.33.

For the record, I note that I fully agree with the majority's discussion of our jurisdiction, Maj. Op. at 109-11.

In relevant part, Title VII renders it an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Notably, all three states in this Circuit have prohibited workplace discrimination on the basis of sexual orientation, as have nineteen other states and the District of Columbia, all through legislation, and not judicial reinterpretation of existing prohibitions on sex discrimination. Under New York law, Zarda was thus able to present his claim that he was subject to workplace discrimination on the basis of his sexual orientation to a jury. The jury decided in favor of his former employer, Altitude Express.